Opinion issued February 17, 2011









In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-08-00311-CV

____________


GULF LIQUIDS NEW RIVER PROJECT, LLC, Appellant


V.


GULSBY ENGINEERING, INC. & GULSBY-BAY PLANT PARTNERS, Appellees



*****


GULSBY-BAY PLANT PARTNERS, GULSBY ENGINEERING, INC., BAY, LTD.
& NATIONAL AMERICAN INSURANCE COMPANY, Appellants


V.


GULF LIQUIDS NEW RIVER PROJECT, LLC & WILLIAMS ENERGY
MARKETING AND TRADING COMPANY, Appellees






On Appeal from the 215th District Court

Harris County, Texas

Trial Court Cause No. 2001-48088






O P I N I O N


 After the parties' industrial construction contract went awry, a jury awarded
over $300 million in contract, tort, and punitive damages to the construction project's
general contractor and its insurer and against the project owner and its primary
investor. Thereafter, the trial court partially granted the project owner's motion for
JNOV, thereby disregarding the jury's tort and punitive findings and entering
judgment for the contractor on the breach of contract and quantum meruit claims
only. The project owner appeals from the judgment entered against it on the breach
of contract claim/quantum meruit claims. The contractor and its insurer appeal from
the trial court's granting of JNOV on the tort and punitive damage findings. 

BACKGROUND

 The following is a brief recitation of the facts giving rise to these appeals.
Additional facts will be introduced as they become relevant to the discussion of the
issues presented. 

A. Tyler & Douglas Plan to Process Refinery Off-Gasses

 Business partners John Douglas and James Tyler planned to build plants to
process refinery "off-gasses" or waste products into more valuable chemicals that
could be sold to third parties for profit. In 1998, their company, Gulf Liquids
Corporation ["GLC"], contracted to purchase off-gasses from a refinery in Chalmette,
Louisiana. GLC then contracted with several parties to purchase the processed off-gasses.

 In 1999, Douglas and Tyler formed Gulf Liquids Holdings, LLC ["Holdings"],
which, in turn, owned Gulf Liquids New River Project LLC ["Gulf Liquids"]. GLC
then assigned to Gulf Liquids the contracts to purchase the off-gas from the
Chalmette refinery and the contracts to sell the processed off-gasses.

 Tyler and Douglas managed Holdings and Gulf Liquids LLC--an entity owned
only by Tyler and Douglas. Gulf Liquids LLC managed Gulf Liquids. In 1999,
Williams Corporation ["Williams"] invested $92.5 million in Holdings. Through its
equity interest in Holdings, Williams possessed an indirect interest in Gulf Liquids.

B. Gulf Liquids Hires Gulsby to Build the Base Project

 The original plan called for two plants to be built. The first was to be a
cryogenic plant to cool and liquify the off-gas from the Chalmette refinery. The
second was to be a fractionator to then process the off-gas. Gulf Liquids hired
Gulsby Engineering, Inc. ["Gulsby"] as the general contractor to build the plants on
a turnkey basis. These two plants are referred to as the Base Project. 

 On October 29, 1999 Gulf Liquids and Gulsby executed two engineering,
procurement, and construction ["EPC"] contracts--one for each of the Base Project
plants. The contracts ["Contracts 1 and 2"] each covered a different plant, but in most
other respects, were identical. Contract 1's fixed price was $13.5 million, to be paid
when certain construction milestones were met. Contract 2's fixed price was $29
million, also payable when certain milestones were met. 

C. NAICO Bonds the Base Project

 National American Insurance Company ["NAICO"] issued payment and
performance bonds for Gulsby. Gulf Liquids, Gulf Liquids's lender, the Bank of
Montreal, and Gulf Liquids's insurer, Winterthur International America Insurance
Company, were the named beneficiaries of the bonds issued by NAICO.

D. The Base Project is Modified after Closing

 After Contracts 1 and 2 were signed, Gulf Liquids contracted to purchase off-gas from Motiva Enterprises' refinery in Convent, Louisiana. After obtaining the
rights to this additional off-gas, Gulf Liquids needed more capacity to process it.
Specifically, the fractionation plant needed to be expanded. Gulsby signed a $12
million change order to the Base Project contracts for the needed expansion, which
provided that the work would be done without any change in the base contract price,
but was "extra work" approved by Parsons, the independent engineer. Construction
later began on the expansion.

E. The Motiva Project is Begun

 In the fall of 2000, Gulf Liquids obtained funding to construct a second
cryogenic plant near the Motiva refinery in Convent, Louisiana. An additional
facility, called the RPG Splitter, was also planned at the site of the original Base
Project. These two undertakings together are referred to as the Motiva Project. 
Gulsby partnered with Bay, Ltd., another construction company, to form Gulsby-Bay
Plant Partners ["GBPP"] to build the Motiva plants.

 In February 2001, Gulf Liquids and GBPP entered two fixed-price contracts
["Contracts 3 and 4"] to build the second cryogenic plant and the RPG Splitter. The
contracts for the Motiva Project are essentially the same as those for the Base Project.

The contracts provided for milestone payments, as well as $12 million in fixed-fee
payments. The fixed fee payments were to compensate Gulsby for the expansion it
had undertaken on the Base Project due to the change order. Gulf Liquids paid $10
million of the fixed-fee payments at closing--the remaining $2 million was to be paid
at the date the final milestone installment was paid.

F. The Relationship between the Parties Deteriorates

 By September 2000, Gulsby's cash flow had become unstable. Gulsby claimed
that it had performed millions of dollars worth of work on the projects, but that
Williams had instructed Gulf Liquids not to pay Gulsby for its work. 

 In February 2001, when the first Motiva Project milestone payments became
due, Gulf Liquids paid $4 million to Gulsby, even though the money was owed to
GBPP. Gulsby's partner, Bay, objected, and GBPP reinvoiced Gulf Liquids for the
$4 million.

 

 Meanwhile, Gulf Liquids was unhappy with progress of the project. Although
the independent engineer had certified the base plants mechanically complete in
March and April of 2001, there had been no successful performance test. Gulf
Liquids was concerned that the plants were not functioning property.

 In May 2001, Gulf Liquids discovered that Gulsby owed over $15 million to
the subcontractors on the Base Project and that there were millions of dollars in liens
being filed against the project. Gulsby claimed that it had not been able to pay the
subcontractors because it had not been paid by Gulf Liquids.

G. NAICO Begins Making Payments on the Bonds

 Gulf Liquids made a demand for NAICO to fulfill its obligation on the payment
bonds. NAICO initially complied and began paying the subcontractors on behalf of
Gulsby. However, in July 2001, NAICO refused to pay under the performance bonds
to ensure the completion of the project.

H. Gulf Liquids Terminates Contracts 1 and 2

 On September 5, 2001, Gulf Liquids notified Gulsby that it was in default of
the Base Project contracts and gave Gulsby time to cure the default. On September
18, 2001, Gulf Liquids formally terminated the Base Project contracts. After Gulf
Liquids terminated Contracts 1 and 2, GBPP abandoned the Motiva Project work
sites.



I. The Lawsuits Commence

 The same day it abandoned the Motiva Project, GBPP sued Gulf Liquids, the
Bank of Montreal, and Winterthur. Gulf Liquids answered and asserted counter-claims and third-party claims against Gulsby and its joint venture partner, Bay. 
Gulsby, Bay, GBPP, and NAICO all asserted claims against Gulf Liquids and its
investor, Williams. Gulsby and its related entities, including NAICO, also sued Tyler
and Douglas in their individual capacities. Gulf Liquids sued Gulsby and GBPP for
breach of the construction contracts, and GBPP for conversion. Shortly before trial
in this case, Tyler and Douglas settled with Gulsby, NAICO, GBPP, and Bay.

J. The Case Goes to Trial

 After a lengthy jury trial, the case was submitted to the jury. In a 145-page jury
charge, the trial court submitted Gulsby's claims against Gulf Liquids of breach of
contract, fraud, fraudulent inducement, quantum meruit, and substantial performance. 
Claims against Williams for fraud, fraudulent inducement, and tortious interference
with contract were also submitted.

 The jury returned a verdict in favor of Gulsby, GBPP, NAICO, and Bay. The
jury found Gulf Liquids liable to Gulsby and Bay for breach of contract, fraud, and
fraudulent inducement. The jury found Williams liable to Gulsby, GBPP, Bay, and
NAICO for fraud and fraudulent inducement. The jury found Williams liable to
NAICO and Gulsby for tortious interference with contract. The jury also found that
Gulf Liquids was Williams's alter ego, that Williams benefitted from Gulf Liquids's
fraud, and that Williams participated in a civil conspiracy with Gulf Liquids.

 After finding in Gulsby's favor, the jury awarded Gulsby approximately $17
million in actual damages and assessed punitive damages of $25 million against Gulf
Liquids and $60 million against Williams. Gulsby elected to recover on its tort and
quantum meruit theories.

 After finding in NAICO's favor, the jury awarded NAICO $20,182,498 in
actual damages and assessed punitive damages of $20 million against Gulf Liquids
and $50 million against Williams.

K. Judgment Notwithstanding the Verdict

 After substantial postverdict briefing and argument, the trial court granted
JNOV as to all of the tort, punitive damage, and vicarious-liability findings. The trial
court then entered judgment for $5,016,682 on Gulsby's breach of contract claim and
$5,746,077 on its quantum meruit claim against Gulf Liquids. The trial court entered
judgment for GBPP for $4,360,155 on its breach of contract claim. The trial court
further ordered that each party should bear its own attorney's fees. 

L. Appellate Mediation

 After the first round of appellate briefs were filed in the case, the parties went
to appellate mediation. GBPP, Bay, Gulf Liquids, and Williams settled all claims
among them. Bay and GBPP withdrew their appellate briefs, and this Court granted
an interlocutory dismissal of their appeals. Thus, the appellate issues regarding
Contracts 3 and 4 have been settled.

M. The Appeals

 Gulf Liquids appeals, contending that the breach of contract and quantum
meruit awards against it must be reversed.

 Gulsby appeals, contending that the trial court erred by granting JNOV as to
its tort claims against Gulf Liquids and Williams and by setting aside the exemplary
damages.

 NAICO appeals, contending that the trial court erred by granting JNOV as to
its tort claims against Gulf Liquids and Williams.

GULF LIQUIDS'S APPEAL

A. Breach of Contract

 In jury question 27, the jury was asked whether Gulf Liquids materially failed
to comply with Contracts 1 and 2 by (1) "failing to pay Gulsby Engineering for the
work performed under Contracts 1 and 2" or by (2) "failing to pay for additional work
under approved change requests." The jury answered both questions affirmatively. 
In jury question 23, the jury was asked whether Gulf Liquids failed to comply with
contracts 1 and 2 by (1) "failing to exercise good faith and reasonable judgment in
determining whether proposed change requests were within the scope of the
contracts," (2) "failing to exercise reasonable judgment with regard to its right to
terminate Contracts 1 and 2," or (3) "[b]y wrongful means prevented Gulsby
Engineering's performance under Contracts 1 and 2 by providing a Basis of Design
that materially differed from the actual feedstream." Based on affirmative answers
to each of these questions, the jury, in question 38, awarded $9,016,682 in breach of
contract damages to Gulsby. (1)

 In its first issue on appeal, Gulf Liquids contends that the trial court erred by
entering judgment based on the breach-of-contract findings by the jury. Specifically,
Gulf Liquids argues that the terms of the contract prevent the breach-of-contract
finding because (1) Gulsby failed to comply with a condition precedent to receiving
payment; (2) it did not breach the contract because it properly terminated the contract;
(3) it did not breach the contract by refusing to pay for "extra work"; and (4) it did not
breach the contract by preventing Gulsby from performing under the terms of the
contract. Gulf Liquids does not contend that it paid Gulsby as required by the
contracts. It contends, as a matter of law, that it was not required to do so because
Gulsby failed to perform a condition precedent to its right to receive payment and the
termination clauses of the contracts precluded a breach.

 1. Condition Precedent

 Gulf Liquids argues that the jury's finding that it breached Contracts 1 & 2 by
failing to pay Gulsby what is owed under the contract cannot stand because, as a
matter of law, the contract allowed it to withhold Gulsby's payment. Specifically,
Gulf Liquids argues that the contract created a condition precedent to payment, which
Gulsby failed to fulfill. Gulf Liquids's position is based on article 5.3 of the contract,
which provides in part as follows:

 During the course of the Work, prior to completion of the Work, and as
a pre-requisite for any payment hereunder, [Gulsby] shall provide
evidence, and [Gulf Liquids] shall be satisfied, that all bills for
equipment, materials, and supplies have been paid in full and that
there are no outstanding liens, claims, or other obligations outstanding
against [Gulsby], [Gulsby's] work product, the Improvements, or the
Sites, related to the Work to be performed under this EPC Contract.


 Gulf Liquids also relies on article 10.2 of the contract, which provides as
follows:

 [Gulsby] shall furnish, monthly, evidence satisfactory to [Gulf Liquids]
and the Independent Engineer that [Gulsby] has made payment of all
bills for labor and materials and other liquidated or unliquidated
claims as a condition to the right of [Gulsby] to receive payment from
[Gulf Liquids] of any money due [Gulsby] hereunder.


 Gulsby responds that these clauses are not conditions precedent to receiving
payment, but are merely a covenant of the contract, and that another contract
provision required Gulf Liquids to request evidence of subcontractor payments before
withholding its performance under the contract.

 "A condition precedent may be either a condition to the formation of a contract
or to an obligation to perform an existing agreement." Hohenberg Bros.Co. v. George
E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976); see II Deerfield Ltd. P'ship v. Henry
Bldg., Inc., 41 S.W.3d 259, 264 (Tex. App.--San Antonio 2001, pet. denied). As
such, a condition precedent may "relate either to the formation of contracts or to
liability under them." Hohenberg Bros., 537 S.W.2d at 3. "Conditions precedent to
an obligation to perform are those acts or events, which occur subsequently to the
making of a contract, that must occur before there is a right to immediate performance
and before there is a breach of contractual duty." Id.; Deerfield, 41 S.W.3d at 264.
Although no words in particular are necessary for the existence of a condition, "such
terms as 'if', 'provided that', 'on condition that', or some other phrase that conditions
performance, usually connote an intent for a condition rather than a promise."
Hohenberg Bros., 537 S.W.2d at 3; Deerfield, 41 S.W.3d at 264-65. "In the absence
of such a limiting clause, whether a certain contractual provision is a condition, rather
than a promise, must be gathered from the contract as a whole and from the intent of
the parties." Hohenberg Bros., 537 S.W.2d at 3; Deerfield, 41 S.W.3d at 265.
"However, where the intent of the parties is doubtful or where a condition would
impose an absurd or impossible result then the agreement will be interpreted as
creating a covenant rather than a condition." Hohenberg Bros., 537 S.W.2d at 3. 
Because of their harshness and operation, conditions precedent are disfavored. 
Criswell v. European Crossroads Shopping Ctr., Ltd., 792 S.W.2d 945, 948 (Tex.
1990); Sirtex Oil Indus. Inc. v. Erigan, 403 S.W.2d 784, 787 (Tex. 1966).

 Gulf Liquids argues that the plain language of articles 5.03 and 10.2 creates
conditions precedent because both articles require proof that Gulsby's subsontractors
have been paid "as a pre-requisite for any payment" and "as a condition to the right
of [Gulsby] to receive payment."

 If we were to consider articles 5.3 and 10.2 in isolation, we might agree with
Gulf Liquids because the clauses use words such as "pre-requisite" and "condition,"
which usually indicate the creation of a condition precedent. See Hohenberg Bros.,
537 S.W.2d at 3; Deerfield, 41 S.W.3d at 264-65. However, when we consider the
contract as a whole, as we must, see Hohenberg Bros., 537 S.W.2d at 3, the intent of
the parties to create a condition precedent rather than an obligation to perform under
the contract, becomes ambiguous.

 Specifically, article 10.3, which directly follows article 10.2, provides as
follows:

 If [Gulf Liquids] has requested [Gulsby] to provide [Gulf Liquids] and
the Independent Engineer with evidence of payment and [Gulsby] has
failed to do so to the reasonable satisfaction of [Gulf Liquids] and the
Independent Engineer, [Gulf Liquids] may at its option withhold
payment of any money due [Gulsby] hereunder until expiration of any
lien periods, and if any claims thereafter remain unpaid by [Gulsby],
[Gulf Liquids] may, whether or not liens have been filed in connection
therewith, retain from the money due [Gulsby] a sufficient amount to
fully protect [Gulf Liquids] against possibility of loss by reason of any
unsatisfied liquidated or unliquidated claim or demand.


Unlike articles 5.3 and 10.2, article 10.3 does not contain any language making its
duty to provide evidence that the subcontractors have been paid a "pre-requisite" or
"condition" of its right to receive payment. In fact, article 10.3 provides that Gulf
Liquids cannot withhold any money due Gulsby unless (1) Gulf Liquids has requested
Gulsby to provide evidence that it has paid its subcontractors, and (2) Gulsby has
failed to do so.

 The Supreme Court has recently held that "absent clear language that a lien
release is a condition precedent to a general contractor performing under the contract
and receiving the contract balance owed to it," such provisions should be construed
as covenants, not conditions precedent. Solar Applications Eng'g, Inc. v. T.A.
Operating Corp., 327 S.W.3d 104, 112 (Tex. 2010). 

 Here, the conflict between articles 5.3 and 10.2 with article 10.3 makes it
ambiguous as to whether the parties intended to create a condition precedent, thus 
we interpret the contract as creating a covenant, not a condition. See Restatement
(Second) of Contracts § 227(2) (1981). Similarly, there is no "clear language"
making Gulsby's duty to provide evidence that the subcontractor's had been paid a
condition precedent, and, under Solar Applications, we should not construe such a
duty to be a condition precedent. 327 S.W.3d at 112.

 Therefore, we conclude that Gulsby's obligation to provide Gulf Liquids with
evidence that the subcontractors had been paid was a covenant or obligation under
the contract, not a condition precedent to performance. Accordingly, we reject Gulf's
Liquids's argument that the breach-of-contract award cannot stand because Gulsby
failed to satisfy a condition precedent. 

 2. Exercised Termination Clause

 Gulf Liquids also contends that it did not breach Contracts 1 & 2 because
terminating Gulsby was both proper and reasonable in light of the termination clauses
in the contracts.

 Article 16 of the contracts provided that Gulf Liquids could terminate the
contracts with or without cause. To terminate for cause, Gulf Liquids was required
to give Gulsby notice of its default and 10 days to cure its default. If terminated for
cause, Gulsby was entitled to receive payment for any work it actually completed, less
amounts Gulf Liquids was entitled to set-off. Article 16.3 of the contract also
provided Gulf Liquids could terminate the contracts without cause. In the event of
a termination without cause under Article 16.3, "[Gulsby's] sole and exclusive
remedy shall be . . . to receive payment for the percentage of Work actually completed
by Gulsby, plus overhead and profit equal to 8% of actual costs to date."

 Finally, the termination clause provided that if Gulf Liquids wrongfully
terminated Gulsby for cause, such termination "shall be deemed a termination without
cause [under article 16.30]."

 Gulf Liquids argues that because the contract permitted it to terminate the
contract with or without cause, it cannot have breached the contract by terminating
it. A provision that provides an owner the right to terminate a contract with or
without cause is often referred to as "termination for convenience" clause. Roof
Systems, Inc. v. John Manville Corp., 130 S.W.3d 430, 442 (Tex. App.--Houston
[14th Dist.] 2004, no pet.); see also 2 Philip Bruner & Patrick O'Connor,
Construction Law § 5:270 (2002). The purpose of such a provision is to permit the 
"owner to unilaterally cancel its contractual obligations [by terminating the contract]
and still avoid committing a breach of contract which would expose it to damages." 
Bruner & O'Connor, supra, § 5:270. We agree that the act of terminating the contract
is not itself a breach of contract by Gulf Liquids because it was merely exercising its
right to terminate the contract with or without cause. However, terminating the
contract does not excuse Gulf Liquids's breach of its obligation to pay that occurred
prior to the time that it exercised its right to terminate; the prior breach by Gulf
Liquids means that its termination of Gulsby was done without cause. 



 3. Extra Work

 Gulf Liquids also appeals the breach-of-contract judgment to the extent that it
includes payments for "extra work." (2) In jury question 23a, the jury found that Gulf
Liquids breached the contract by "failing to exercise good faith and reasonable
judgment in determining whether proposed change requests were within the scope of
the contracts." In jury question 38 (c) and (d), the jury awarded damages for "amounts
owed by Gulf Liquids, but not paid for the approved change requests [on Contracts
1 and 2]". Gulf Liquids argues that it did not breach the contract by determining that
certain claims were not compensable as "extra work." Specifically, Gulf Liquids
argues that "since [Gulsby] undisputedly failed to comply with the contracts'
mandatory procedures governing extra work [requiring prior written authorization
and a description on a written change order], Gulf Liquids could not have acted
unreasonably or in bad faith in determining that [Gulsby] was not entitled to
compensation for that claimed extra work."

 Gulsby responds that because Gulf Liquids breached the contract, it cannot rely
on the "procedural rights" set forth in the "extra work" provisions of the contract. We
agree. In City of Baytown v. Bayshore Constructors, Inc., 615 S.W.2d 792 (Tex. Civ.
App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.), a contractor sued its employer
alleging that the contractor incurred damages caused by "extra work" as a result of
the employer's failure to provide adequate plans and specifications for the project. 
Id. at 793. On appeal, the owner alleged that there was insufficient evidence to show
that the contractor had submitted its extra work claims to the owner in a manner that
complied with the terms of the contract. Id. This Court held that "when an owner
breaches a building contract it relinquishes its contractual procedural rights
concerning change orders and claims for additional costs." Id. at 793-94; see also
N. Harris Cnty. Junior Coll. Dist. v. Fleetwood Constr. Co., 604 S.W.2d 247, 254
(Tex. Civ. App.--Houston [14th Dist.] 1980, writ ref'd, n.r.e.) (holding same). 
Because Gulf Liquids failed to pay Gulsby under Contracts 1 & 2, it cannot now rely
on the procedural provisions of the extra work clauses in those contracts to avoid
payment for extra work.

 4. Preventing Gulsby's performance

 In jury question 23, the jury found that Gulf Liquids materially failed to comply
with the contracts because it "by wrongful means prevented [Gulsby's] performance
under Contracts 1 and 2" by providing a Basis of Design that materially differed from
the actual feedstream. We need not address this issue because we have already
upheld liability findings that Gulf Liquids breached the contracts by refusing to pay
Gulsby what it was owed under Contracts 1 and 2 and for its approved extra work.

 Based on our resolution of these issues, we conclude that the trial court
properly refused to disregard the jury's liability finding that Gulf Liquids breached
Contracts 1 and 2 by refusing to pay Gulsby amounts due under those contracts and
for approved "extra work."

 We overrule Gulf Liquids's first issue on appeal.

B. Reduction of Contract Damages

 In its second issue on appeal, Gulf Liquids contends that Gulsby's contract
damages must be reduced because (1) the termination clause of the contracts limited
damages, (2) the damages are not supported by sufficient evidence, (3) the damages
should be reduced because of the "one-satisfaction rule." We agree that the
termination clause limits Gulsby's contract damages. 

 1. The Termination Clause

 Gulf Liquids claims that "the district court was not at liberty to simply
disregard Gulf Liquids's termination rights" under the contract, and that the trial court
erred by submitting jury question number 38, which asked the jury to determine what
amount of money would compensate Gulsby for Gulf Liquids's breach of contract. 
Gulf Liquids argues that the termination clause was a contractual limitation on the
amount of damages Gulsby could recover. 

 The jury determined that Gulsby did not breach the contracts, thus Gulf
Liquid's attempt to terminate for cause was wrongful, and, under the terms of the
contract Gulf Liquids's termination is deemed a termination without cause. We
address the effect of the termination-without-cause provision on Gulsby's right to
recover benefit-of-the-bargain contractual damages.

 One purpose of a termination-for-convenience clause is to prevent "benefit-of-the-bargain" damages in the event that the owner unilaterally and without cause
terminates the contract. See 2 Bruner & O'Connor, supra, § 5:270. Parties may also
contractually agree to the measure of damages in the event of a breach. See Fidelity
& Deposit Co. v. Stool, 607 S.W.2d 17, 24 (Tex. Civ. App.--Tyler 1980, no writ)
("[I]t is well established that parties having agreed upon the measure of damages for
breach of their contract are accordingly bound."); Buhler v. McIntire, 365 S.W.2d
237, 239-40 (Tex. Civ. App.--Austin 1963, writ ref'd n.r.e.) ("The general rule
seems to be that parties having agreed upon the measure of damages for breach of
their contract are accordingly bound."). The termination-for-convenience clause in
this case specifically limits Gulsby's damages in the event of a wrongful termination
to "payment for the percentage of Work actually completed by Gulsby, plus overhead
and profit equal to 8% of actual costs to date."

 Gulsby, however, argues that, because Gulf Liquids breached the contract it
cannot rely on the termination-for-convenience clause to limit its damages. 
Specifically, Gulsby relies on City of Baytown, 615 S.W.2d at 793-94, Baker Marine
Corp. v. Weatherby Eng'g Co., 710 S.W.2d 690, 696 (Tex. App.--Corpus Christi
1986, no writ), and Sterling Projects, Inc. v. Fields, 530 S.W.2d 602, 606 (Tex. Civ.
App.--Waco 1975, no writ), all of which hold that when an owner breaches a
building contract, it relinquishes its procedural rights concerning change orders and
claims for additional costs. None of these cases, however, addresses the issue of
whether the breach of contract by an owner results in the forfeiture of contractual
provisions that would limit the contractor's remedies.

 Gulf Liquids argues that failing to enforce the contracts' limitation-of-damages
provision would render the termination-for-convenience clause meaningless. We
agree. The clause expressly contemplates that if Gulf Liquids wrongfully terminates
Gulsby, the termination will be deemed a termination without cause, and limits
Gulsby's damages accordingly. Such a clause would never be enforceable if by
wrongfully terminating, the owner also loses the right to exercise the termination-for-convenience clause and the limitation-of-damages provision found therein.

 Because the contract expressly contemplates that the owner may wrongfully
terminate the contractor, and then limits the contractor's damages to those specified
in the clause, we will not render that provision meaningless by holding that the
owner's rights are waived by committing the very breach that the clause
contemplates. Such circular reasoning would render the termination-for-convenience
clause meaningless, which we will not do. See Tenn. Gas Pipeline Co. v. Technip
USA Corp., No. 01-08-00535-CV, 2008 WL 3876141, at *23 n.11 (Tex.
App.--Houston [1st Dist.] August 21, 2008, pet. denied) (refusing to nullify party's
right to receive notice of breach based on party's breach). As such, we conclude that
Gulsby's right to recover damages for breach of contract was limited to the amounts
specified in the termination-for-convenience clause. See Am. Mfrs. Mut. Ins. Co. v.
Schaefer, 124 S.W.3d 154, 162 (Tex. 2003) (holding, even if insurer breached
agreement, insured only entitled to remedies set forth in contract). The trial court
therefore erred in submitting jury question 38(a) and (b), which permitted Gulsby to
recover benefit-of-the bargain damages for the breach of Contracts 1 and 2.

 We also consider what effect, if any, the termination-for-convenience clause
had on Gulsby's right to recover damages for approved extra work, which was
submitted to the jury in question 38 (c) and (d). While a termination-for-convenience
clause prevents a contractor from recovering benefit-of-the-bargain damages because
of the termination of the contract, any pre-termination claims that the contractor was
owed more money for approved and completed extra work are preserved. See
Bruner & O'Connor, supra, § 5:270 (stating "if the [owner] owed the contractor
more money as a result of differing site conditions or defective plans and 
specifications, then the [owner] cannot escape this liability merely by seeking to
terminate the contract for convenience"). Thus, we conclude that Gulsby's right to
recover for pre-termination extra work, which the jury found that Gulf Liquids had
approved, which the jury found to be owed, and which was not included in the
original contract price, is not limited by the termination-for-convenience clause. As
such, the trial court did not err in submitting jury question 38(c) and (d), which
permitted Gulsby to recover for pre-termination extra work done for contracts 1 and
2.

 2. One-Satisfaction Rule and Sufficiency of Damages Evidence

 Additionally, Gulf Liquids argues that Gulsby's contract damages should be
reduced by $2,500,000 because "shortly before trial [Gulsby] signed, benefitted from,
and was party to a settlement agreement between [Gulsby] and NAICO, on one hand,
and Tyler and Douglas on the other hand." Gulf Liquids also argues that there is
insufficient evidence to support the contract damages awarded. Because we agree
with Gulf Liquids that the contract damages should have been limited by the
termination-for-convenience clause, we need not address these alternative issues
regarding the contractual damages awarded, and decline to do so.

 Because we agree that the contract provisions limited Gulsby's damages, we
sustain Gulf Liquid's second issue on appeal.


C. Conclusion Regarding Breach of Contract

 Because we have held that Gulsby's obligation to show proof that its
subcontractors had been paid was not a condition precedent to its right to receive
payment from Gulf Liquids, the trial court did not err by submitting jury question
number 27, which established Gulf Liquids's contractual liability for breach of
contract for failure to pay for work performed under Contracts 1 and 2 and for
additional work under approved change requests. 

 However, we hold that the trial court erred in submitting jury question 38(a)
and (b), which allowed the jury to determine benefit-of-the-bargain damages for Gulf
Liquids's failure to pay Gulsby under Contracts 1 and 2. The contract between the
parties clearly limited the damages recoverable to preclude benefit-of-the-bargain
damages. The trial court, however, did not err by submitting jury question 38 (b) and 
(c) because the termination-for-convenience clause does not limit the damages
recoverable by Gulsby for pre-termination, approved extra work.

 Because we cannot determine how the trial court arrived at its $5,016,682
breach of contract award on Gulsby's breach or what portion of that award was
erroneously attributable to benefit-of-the-bargain damages, we reverse the damages
award for breach of contract and remand for further proceedings. See Tex. R. App.
P. 44.1(b).


D. Quantum Meruit

 The trial court's judgment awarded Gulsby $5,016,682 from Gulf Liquids on
Gulsby's quantum meruit claims. In its third issue on appeal, Gulf Liquids argues
that quantum meruit is precluded because an express contract covers the subject
matter of the recovery. See In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 740
(Tex. 2005). Gulsby responds that construction contracts provide an exception to this
general rule.

 Quantum meruit is an equitable theory of recovery based on an implied
agreement to pay for benefits received. Heldenfels Bros., Inc. v. City of Corpus
Christi, 832 S.W.2d 39, 41 (Tex. 1992). Recovery under the theory of quantum
meruit is prohibited if an express contract covers the services or materials for which
the claimant seeks recovery. Truly v. Austin, 744 S.W.2d 934, 936 (Tex. 1988). 
However, there is an exception with respect to construction contracts. See id. at 937. 
A contractor may recover the reasonable value of the services rendered and accepted
or the materials supplied under the theory of quantum meruit if: (1) the services
rendered and accepted are not covered by the contract; (2) the contractor partially
performed under the terms of an express contract, but was prohibited from completing
the contract because of the owner's breach; or (3) the contractor breached but the
owner accepted and retained the benefits of the contractor's partial performance. See
Truly, 744 S.W.2d at 936-37; DiMiceli v. Affordable Pool Maintenance, Inc., 110
S.W.3d 164, 169-70 (Tex. App.--San Antonio 2003, no pet.); Garcia v. Kastner
Farms, Inc., 789 S.W.2d 656, 661 (Tex. App.--Corpus Christi 1990, no writ).

 Gulf Liquids argues that the contractor exception does not apply because (1)
the services rendered and accepted were covered by the contract, and (2) Gulsby is
not entitled to recover quantum meruit based on partial performance.

 1. Services Rendered and Accepted Covered by Contract

 In jury question 40, the jury was asked to determine whether Gulsby
"performed any compensable work for Gulf Liquids that was outside the scope of
Contracts 1 and 2." The question then submitted a laundry list of 18 items that
Gulsby claimed it performed that were outside the scope of the contracts. The jury
answered "YES" to 16 of the 18 items of Gulsby's work.

 On appeal, Gulf Liquids complains that the 16 items for which Gulsby
recovered in quantum meruit were either included in the contracts' scope of work, or
included in the contract as "extra work." Gulf Liquids also argues that "the quantum
meruit liability question impermissibly asked the jury to decide a question of law: 
whether certain items of work were 'outside the scope' of the contracts, a pure
question of contract interpretation properly for the trial court, not the jury." 

 The construction of a written instrument is a question of law for the trial court.
MCI Telecomm., Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 650-51 (Tex. 1999). 
When the evidence shows that no contract covers the service at issue, then the
question of whether a party may recover in quantum meruit is for the trier of fact. See
Producers Grain Corp. v. Lindsay, 603 S.W.2d 326, 328 (Tex. Civ. App.--Amarillo
1980, no writ).

 The question this Court must decide is whether the 16 items submitted in the
quantum meruit damage question were, in fact, covered by the contract. Gulf Liquids
claims that the contract covers all 16 items because each item was either within the
"scope of work" or was "extra work" as those terms are defined by the contract.

 Article 3.1 of the Contract defines the "scope of work" as all of the items listed
on Exhibit A of the Contract. Exhibit A contains five pages of "work" to be
peformed by Gulsby. "Work" is defined in Article 1.12 as "the activity specified
herein for accomplishment of the engineering, design, procurement, fabrication,
reconditioning, and installation of the Improvements as authorized by [Gulf Liquids]. 
When used as a noun, Work includes the engineering, design, fabrication, and
construction of improvements."

 The contract also contains what the parties refer to as "extra work" provisions. 
Article 1.4 defines "extra work" as "any item of Work not specified by or set out in
this EPC Contract and not within the reasonable intent of its provisions, which
[Gulsby] is required to perform. To the extent that the Extra Work is approved or
authorized by [Gulf Liquids] and the Independent Engineer as provided for herein,
such may be referred to as 'Work.'" Article 3.3 of the Contract provides that "[Gulf
Liquids], with the concurrence of the Independent Engineer, shall have the right to
alter, deter from, or add to the Work described in Exhibit A hereto, provided that such
alteration, deletion or addition is directly related to the Work described in Exhibit A
hereto and does not constitute or affect a substantially different undertaking." 
Finally, Article 9.2 provides that "if the Project Manager and the Independent
Engineer determine that all or a portion of the Work is not within the scope of this
EPC contract, such Work shall be paid for as Extra Work."

 Gulsby argues that these provisions do not bar its recovery for quantum meruit
because the jury found that Gulsby's performance of the 16 items listed was "outside
the scope" of the contracts. Thus, Gulsby argues that "the jury necessarily found that
the work constituted a 'substantially different undertaking' that the work the parties
agreed to under the contracts."

 We disagree with Gulsby's interpretation. "Extra work" is by definition "Work
not specified by or set out in this EPC Contract and not within the reasonable intent
of its provisions." Even if the items listed in the quantum meruit question are outside
the "scope of the contract," they are "extra work" as long as they are "directly related
to the work" and "do not or constitute or affect a substantially different undertaking." 
There is no jury finding that the items listed were not "directly related to the work"
or that they were a "substantially different undertaking."

 Thus, we conclude that the 16 items listed in the quantum meruit question were
either within the "scope of work" or were "extra work." Because the items listed in
the quantum meruit question were covered by the express terms of the contract, no
quantum meruit claim will lie. See Truly, 744 S.W.2d at 936.

 2. Partial Performance 

 We next consider whether Gulsby is entitled to recover under quantum meruit
because it partially performed, but was prohibited from completing performance
because of Gulf Liquids's breach. Under Texas law, when a contractor has
substantially performed a building contract, he is entitled to bring a contract cause of
action to recover the full contract price less the cost of remedying those defects that
are remediable. Vance v. My Apartment Steak House of San Antonio, Inc., 677
S.W.2d 480, 481 (Tex. 1984). If, however, the contractor has not substantially
performed, he may bring a quantum meruit claim as an alternative to a contract claim. 
Dobbins v. Redden, 785 S.W.2d 377, 378 (Tex. 1990); see also Murray v. Crest
Constr., Inc., 900 S.W.2d 342, 345 (Tex. 1995) (holding that because contractor had
not substantially performed, it could not recover under contract but could bring cause
of action in quantum meruit).

 Here, in jury question 37, the jury found that Gulsby had substantially
performed the work to be completed under the Contracts. Thus, Gulsby may recover
its damages under the contract, but it may not maintain a cause of action for quantum
meruit. See DiMiceli, 110 S.W.3d at 170 (stating that because contractor completed
the contract, it "cannot recover on the theory of quantum meruit on the basis of partial
performance").

 Accordingly, we sustain Gulf Liquids's third issue on appeal. We reverse the
quantum meruit award and render judgment that Gulsby take nothing on its quantum
meruit claim against Gulf Liquids.

E. Conditional Issues 

 In three conditional issues on appeal, Gulf Liquids contends that (1) there was
charge error on the breach of contract questions, (2) there was Casteel (3) error in the
charge, and (3) that the trial court erroneously admitted evidence of its insurance. 
Because we have reversed and rendered judgment against Gulsby on its quantum
meruit claims and reversed and remanded its breach of contract claims, we need not
reach Gulf Liquids's conditional issues because they would afford it no further relief
than that it has already received.

GULSBY'S APPEAL

 In addition to the breach of contract discussed above, the trial court also
submitted fraudulent inducement, fraud, and punitive damage issues to the jury. The
jury found in Gulsby's favor and awarded actual and punitive damages accordingly. 
Gulsby elected to recover its tort damages rather than its breach-of-contract damages. 
Gulf Liquids and Williams moved for judgment notwithstanding the verdict
["JNOV"], which the trial court granted. Gulsby appeals, contending that the trial
court erred in granting JNOV and (1) disregarding the jury's fraud findings; (2)
disregarding the jury's findings that Williams tortiously interfered with Gulsby's
contracts; (3) disregarding the jury's findings that Williams is responsible for Gulf
Liquids's conduct; (4) setting aside the punitive damages awards; (5) excluding Jerry
Gulsby's testimony about the value of his company; (6) reducing the damages on
Gulsby's breach-of-contract and quantum-meruit claims; and (7) failing to award
Gulsby its attorney's fees.

A. JNOV of Fraudulent Inducement Claims

 In its first issue on appeal, Gulsby contends the trial court erred by granting
JNOV on its fraudulent inducement claims against Gulf Liquids. In jury question 57,
the jury was asked whether Gulf Liquids fraudulently induced Gulsby to enter into
Contracts 1 and 2. The jury was instructed to consider only Gulf Liquids's acts or
omissions prior to the execution of Contracts 1 and 2. The jury answered question
57 affirmatively and awarded the following damages: (a) $1,270,588 for the contract
price owed on Contract 1 less the amount paid by Gulf Liquids under the contract; (b)
$2,836,346 for the contract price owed on Contract 2 less the amount paid by Gulf
Liquids under the contract; (3) $2,000,000 for monies owed on the Geismar
expansion less the amount paid by Gulf Liquids; (4) $66,855.00 for amounts owed
by Gulf Liquids, but not paid under change requests on Contract 1; (5) $2,842,893 for
amounts owed by Gulf Liquids, but not paid under change requests on Contract 2. 
On appeal, Guslby contends the trial court erred in granting JNOV and disregarding
the jury's findings on fraudulent inducement of contract.

 1. Standard of Review and Law Applicable to Fraudulent Inducement

 A trial court may disregard a jury finding and enter a JNOV if the finding is
immaterial or if there is no evidence to support one or more of the jury findings on
issues necessary to liability. Tiller v. McLure, 121 S.W.3d 709, 713 (Tex. 2003);
Spencer v. Eagle Star Ins. Co., 876 S.W.2d 154, 157 (Tex. 1994); Williams v.
Briscoe, 137 S.W.3d 120, 124 (Tex. App.--Houston [1st Dist.] 2004, no pet.). A trial
court may grant a motion for JNOV if a directed verdict would have been proper. 
Tex. R. Civ. P. 301. 

 Fraudulent inducement is a type of fraud claim that requires a showing that (1)
a false material misrepresentation was made that was either known to be false when
made or was asserted without knowledge of its truth or falsity, (2) it was intended to
be acted on, (3) it was relied on, and (4) it caused injury. See Formosa Plastics Corp.
USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998). "As a
rule, a party is not bound by a contract procured by fraud." Formosa Plastics, 960
S.W.2d at 46. Indeed, "the law long ago abandoned the position that a contract must
be held sacred regardless of the fraud of one of the parties in procuring it." Id.
(quoting Bates v. Southgate, 31 N.E.2d 551, 558 (1941)). Fraudulent inducement is
a particular species of fraud that arises only in the context of a contract and requires
the existence of a contract as part of its proof. Haase v. Glazner, 62 S.W.3d 795, 798
(Tex. 2001); Clark v. Power Mktg. Direct, Inc., 192 S.W.3d 796, 799 (Tex.
App.--Houston [1st Dist.] 2006, no pet.). That is, with a fraudulent inducement
claim, the elements of fraud must be established as they relate to an agreement
between the parties. Haase, 62 S.W.3d at 798-99.

 2. False, Material Misrepresentations Claimed by Gulsby 

 Gulsby points to four misrepresentations by Gulf Liquids that induced it to
enter the contracts: (1) the size of the Chalmette site, (2) the components and
contaminents in the feedstream from the Chalmette plant; (3) a promise to reimburse
Gulsby for additional surety-bond coverage; and (4) a promise to pay Gulsby for
increased utility costs. 

 First, Gulsby points to evidence that Douglas, of Gulf Liquids, misrepresented
the size of the Chalmette site. Douglas told Jerry Gulsby that the Chalmette site was
1.5 to 2.0 acres in size. Actually, the site was only .8 acres. Gulsby testified that he
relied on Douglas's representation about the size of the site in designing and pricing
the Chalmette plant. After Gulsby executed the contracts, Jerry Gulsby discovered
the true size of the site. His plans then had to be modified to build the plant
vertically, rather than horizontally. The cost of having to adjust the plans cost Gulsby
an additional $2.38 million.

 Second, Gulsby introduced evidence that Gulf Liquids misrepresented the
"feedstream" or off-gasses that would leave the Chalmette Refinery and be processed
at the Chalmette cryogenic plant. Douglas testified that he was aware that an accurate 
knowledge of the feedstream was essential to Gulsby's design of the plant. One and
one-half months before the contracts were signed, Gulf Liquids provided a "basis of
design" to Jerry Gulsby. The basis of design was based on five years of historical
data from the Chalmette refinery, which Gulf Liquids reduced to a single document
containing specific numbers of each component and contaminant in the feedstream. 
Gulsby used this basis of design to design the plant. However, the basis of design
was inaccurate. Specifically, the basis of design stated that 10% of ZSM-5, a catalyst,
would be in the feedstream. The use of ZSM-5 in the feedstream was critical to make
the project profitable. However, the amount of ZSM-5 in the feedstream was actually
much lower. Gulsby introduced a memo created before the contracts were signed in
which a Gulf Liquids employee states that "we are kidding ourselves if we think we'll
see 10+% ZSM-5 additions anytime soon (2 yrs)" at the Chalmette refinery.

 Additionally, the basis of design was based on historical data and thus it did
not account for the fact that the Chalmette Refinery had recently begun processing
"Cerro Negro crude," a high-sulfur crude oil that increased the amount of sulfur in
the feedstream by 400%. As a result of the increased sulfur in the feedstream, Gulsby
had to modify plans for the plant, which increased its cost.

 Third, Gulsby introduced evidence that before the contracts were signed,
Gulsby obtained two $10 million surety bonds from NAICO. However, before
closing, Douglas told Gulsby that the contracts had to be bonded for the full contract
price. The cost for the additional bonding was $1.875 million. When Gulsby
complained that he could not absorb such a "hit right off the top," Douglas promised
Gulsby that if it obtained the additional bonding, Gulf Liquids would reimburse
Gulsby for the increased cost. Jerry Gulsby testified that he would not have signed
the contracts had Gulf Liquids not promised to reimburse Gulsby for the increased
bonding costs. Gulf Liquids never reimbursed Gulsby for the additional bonding
expenses.

 Finally, Gulsby presented evidence that shortly before closing he determined
that he would actually need to increase the horsepower of the plant. When Jerry
Gulsby expressed his reluctance to sign the contracts because need for increased
horsepower would be a "15 percent hit" on the contract, Gulf Liquids promised to
reimburse Gulsby for the additional utility costs if Gulsby would sign the contracts 
as scheduled. Gulf Liquids never reimbursed Gulsby for the additional utility costs
necessary to increase the horsepower of the plant.


 3. Justifiable Reliance

 Gulf Liquids, however, claims that these misrepresentations are not actionable. 
Specifically, Gulf Liquids argues that the statements are immaterial and should not
have been submitted to the jury because (1) "this is inherently a breach-of-contract
case, and punitive damages cannot be assessed for breach of contract"; and (2) the
merger clauses of the contracts preclude Gulsby's reliance on any purported oral
misrepresentation. We agree with the latter.

 Gulf Liquids argues that, in light of several contract provisions, Gulsby could
not have justifiably relied on the claimed misrepresentations. Fraud requires that a
plaintiff show actual and justifiable reliance. Grant Thornton LLP. v. Prospect High
Income Fund, 314 S.W.3d 913, 923 (Tex. 2010). In evaluating justification, we
consider whether "given a fraud plaintiff's individual characteristics, abilities, and
appreciation of facts and circumstances at or before the time of the allged fraud[,] it
is extremely unlikely that there is actual reliance on the plaintiff's part." Id. (quoting
Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1026 (5th Cir. 1990)). "[A]
person may not justifiably rely on a representation if there are 'red flags' indicating
such reliance is unwarranted." Id. (quoting Lewis v. Bank of Am., N.A., 343 F.3d 540,
546 (5th Cir. 2003)).



 a. Additional Agreements Made Pre-Contract

 In its motion for JNOV, Gulf Liquids, relying on Schlumberger Tech. Corp. v.
Swanson, 959 S.W.2d 171, 179-80 (Tex. 1997), argued that the merger clauses in the
contracts preclude Gulsby's reliance on any pre-contract oral representations or
modifications, thus foreclosing its fraudulent-inducement cause of action as a matter
of law.

 In Schlumberger, the Swansons and Schlumberger became joint venturers in
a project to mine diamonds from the ocean floor. 959 S.W.2d at 173. After a dispute
between the parties arose, the Swansons sold their interest in the joint venture to
Schlumberger. Id. at 174. As a part of the sale, the Swansons relinquished all rights,
claims, and interests in the offshore diamond project and released all causes of action
against Schlumberger, known or unknown. Id. In the release, the Swansons
specifically agreed that they were not relying on any statement or representation by
Schlumberger, that they were relying on their own judgment, and that they had been
represented by counsel who had explained the entire contents and legal consequences
of the release. Id. Later, the Swansons sued Schlumberger, claiming that
Schlumberger had fraudulently induced them to sell their interest in the joint venture
at an undervalued price. Id. After a jury found in favor of the Swansons,
Schlumberger claimed on appeal that the release precluded all of the Swansons' tort
claims as a matter of law. Id. at 175. Recognizing that parties should be able to
effectively settle their disputes, the court agreed with Schlumberger, holding that
when the parties' intent is clear and specific, they can disclaim reliance on any oral
representations thus negating a fraudulent inducement claim. Id. at 179, 181.

 In Forest Oil Corp. v. McAllen, 268 S.W.3d 51, 61 (Tex. 2008), the supreme
court expressly declined "to adopt a per se rule that a disclaimer [of reliance]
automatically precludes a fraudulent-inducement claim ," recognizing that "facts may
exist where the disclaimer lacks 'the requisite clear and unequivocal expression of
intent necessary to disclaim reliance' on the specific representations at issue." Id. at
61, 60 (quoting Schlumberger, 959 S.W.2d at 179). The court further advised that
when determining whether a waiver-of-reliance provision is binding, court must
examine the contract itself and the totality of the surrounding circumstances,
including whether (1) the terms of the contract were negotiated, rather than
boilerplate, and during negotiations the parties discussed the issue which has become
the topic of dispute; (2) the complaining party was represented by counsel; (3) the
parties dealt with each other in an arm's length transaction; (4) the parties were
knowledgeable in business matters; and (5) the release language was clear. Id. at 60.

 Gulf Liquids claims that Article 25.10 of the contracts expressly disclaims any 
reliance on oral representations by Gulf Liquids; thus Gulsby's reliance, a necessary
element of fraudulent inducement, fails.

 Article 25.10 provides as follows:

 . . . [T]his EPC Contract and the attached Exhibits hereto constitute the
entire agreement between [Gulf Liquids] and [Gulsby] pertaining to
engineering, design, procurement, fabrication, and installation of the
Work. None of these documents may be amended except by a writing
signed by both Parties. No promise, agreement, or representation not set
forth in this EPC Contract or an attached Exhibits [sic] shall be of any
force or effect.


 We note that three of the four misrepresentations alleged by Gulsby--that it
was promised additional compensation for extra insurance and horsepower costs and
representations about the site size--involve alleged oral agreements made before the
contract was signed and were never incorporated in the EPC contracts by the parties. 
Thus, the merger clause expressly covers these situations and prohibits evidence of
additional pre-contract terms from serving as the basis for a fraudulent inducement
claim. See IKON Office Solutions, Inc. v. Eifert, 125 S.W.3d 113, 125-28 (Tex.
App.--Houston [14th Dist.] 2003, pet. denied) (providing that provisions that
contract was "entire agreement" and requiring any modifications to be in writing
barred fraudulent-inducement claim under Schlumberger).

 b. Feedstream Components

 The remaining misrepresentation--feedstream components--is not specifically
addressed in the merger clause. Thus, we consider whether Gulsby could reasonably
rely or was damaged by an erroneous basis of design, which was incorporated in the
contract as Exhibit B, and provided that 10% of the catalyst ZSM-5 would be in the
feedstream.

 Gulf Liquids argues that Gulsby was required to create a design that would
function under the feedstream provided, and that, if the feedstream provided was
inaccurate, Gulf Liquids, not Gulsby, would be the party harmed. In other words,
Gulf Liquids argues that Gulsby would not be in breach of contract if it failed to
design a plant that would function because of an erroneously defined feedstream. We
agree. 

 Article 8.2 of the Contract provides as follows:

 [Gulsby] hereby warrants the treating and process design and all
Improvements and equipment furnished, constructed or installed by
[Gulsby] to be free from defect in design and that, provided the
Improvements and equipment are utilized in accord with all reasonable
operating practices, and containing constituents and mol percentages of
constituents which do not materially differ from Exhibit B, the Work
Improvements, and equipment [Gulsby] shall produce the recovery rates
as stated on Exhibit C.


This section of the contract makes it clear that Gulsby was not responsible for failure
of its design to produce recovery rates indicated in the contract if the components of
the feedstream differed materially from those set forth in Exhibit B. Because Gulsby
could not provide a working system based on an erroneous basis of design, it was not
legally responsible and thus cannot have suffered any harm because of the erroneous
design. 

 Furthermore, article 3.3 of the contract provides that "[Gulf Liquids] . . . shall
have the right to alter, delete from, or add to the work described in Exhibit A,
provided that such alteration, deletion, or addition is directly related to the Work
described in Exhibit A hereto and does not constitute or affect a substantially
different undertaking." The contract further provides that, under certain conditions,
Gulf Liquids will pay for alterations or additions to the Work by way of written
change orders as Extra Work. 

 Article 3.3 gives Gulsby notice in the contract that Gulf Liquids had the right
to alter, delete, or change the Work of the Contract. Thus, Gulsby cannot claim that
it reasonably relied on the basis of design, including the feedstream set forth therein,
as being unchangeable. 

 In sum, Gulsby cannot show that it was harmed by the change in the feedstream
numbers because it was not contractually bound to design a system that would
function with the altered feedstream numbers. Also, Gulsby cannot show that it
reasonably relied on the feedstream calculations because the contract gave Gulf
Liquids the right to change the feedstream calculations and thereby change the scope
of Gulsby's work. We note that any change in the scope of the Work by Gulf Liquids
would have given Gulsby the right to request extra compensation for the extra work. 
Thus, alterations in the feedstream could have led to a claim for extra work
compensation by Gulsby. Accordingly, the trial court did not err in granting JNOV
and disregarding the fraud findings against Gulf Liquids. 

 We overrule Gulsby's first issue on appeal.



B. JNOV of Tortious Interference Claims against Williams

 In its second issue on appeal, Gulsby contends the trial court erred in
disregarding the jury's findings that Williams tortiously interfered with Gulby's
contracts. In jury question 61a, the jury was asked whether Williams intentionally
interfered with Contracts 1 and 2. The jury was instructed that "[i]nterference is
intentional if committed with the desire to interfere with the contract or with the
belief that interference is substantially certain to result. The jury answered question
61a affirmatively. In jury question 62, the jury was also asked whether Williams's
interference was justified. The jury was instructed that "[i]nterference with a contract
is justified if the interfering party had a good faith belief that it had a right to do so." 
The jury answered question 62 negatively. In jury question 67, the jury awarded the
same amount of damages for Williams's tortious interference as it did for Gulf
Liquids's fraudulent inducement. 

 A trial court may disregard a jury finding and enter a JNOV if the finding is
immaterial or if there is no evidence to support one or more of the jury findings on
issues necessary to liability. Tiller, 121 S.W.3d at 713. 

 Gulsby's position at trial was that Williams tortiously interfered with its
contracts with Gulf Liquids by, essentially, taking over the change order process and
preventing Gulf Liquids from paying Gulsby for change orders that Gulf Liquids and
the independent engineer had already approved. Williams, however, responds that
the trial court properly disregarded the jury's findings that it tortiously interfered with
Gulsby's contracts because it was, as a matter of law, justified in interfering. We
agree with Williams.

 In jury question 62a, the jury was asked whether Williams's interference was
justified and was instructed that "[i]nterference with a contract is justified if the
interfering party had a good faith belief that it had a right to do so." The jury
answered question 62a negatively. Williams argues that, because it established its
legal right to interfere as a matter of law, the jury's negative finding on the issue is
immaterial. 

 Justification is an affirmative defense to tortious interference with contract and
tortious interference with prospective business relations. Prudential Ins. Co. of Am.
v. Fin. Review Servs., Inc., 29 S.W.3d 74, 80 (Tex. 2000) (citing Calvillo v. Gonzalez,
922 S.W.2d 928, 929 (Tex. 1996)). The justification defense can be based on the
exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable
legal right, even though that claim ultimately proves to be mistaken. Id.; Tex. Beef
Cattle Co. v. Green, 921 S.W.2d 203, 211 (Tex. 1996). If a trial court finds as a
matter of law that the defendant had a legal right to interfere with a contract, the
defendant has conclusively established the justification defense, and the motive is
irrelevant. Prudential, 29 S.W.3d at 80; Tex. Beef Cattle, 921 S.W.2d at 211. 
Alternatively, if the defendant cannot prove justification as a matter of law, it can still
establish the defense if the trial court determines that the defendant interfered while
exercising a colorable right, and the jury finds that, although mistaken, the defendant
exercised that colorable right in good faith. Prudential, 29 S.W.3d at 80; Tex. Beef
Cattle, 921 S.W.2d at 211.

 Williams argues that it was exercising its own legal rights in regard to the
change orders, thus its actions were justified. We agree. The record shows that,
under the Holdings Operating Agreement between Williams and Tyler and Douglas
of Gulf Liquids, Williams had the contractual right to require Tyler and Douglas to
obtain its express written consent before "incur[ring] any liability or mak[ing] any
single expenditure or series of related expenditures in an amount exceeding
$10,000.00." Enforcing or complying with one's own valid contract does not
constitute unjustifiable interference with another's contract. Magnard v. Caballero,
752 S.W.2d 719, 721 (Tex. App.--El Paso 1988, writ denied).

 Because Williams established, as a matter of law, that it was exercising its own
contractual right to require Gulf Liquids to obtain its approval before authorizing
expenditures, it has shown that its actions were justified. Whether Williams acted in
good faith is, thus, irrelevant, Tex. Beef Cattle, 921 S.W.2d at 211. Thus, the jury's
finding in jury question 62a that Williams did not act in good faith is also irrelevant. 
 Because, as a matter of law, Williams's interference was justified, the trial court did
not err in disregarding the jury's finding that Williams tortiously interfered with
Gulsby's contracts. Accordingly, we overrule Gulsby's second issue on appeal.

C. Williams's Responsibility for Gulf Liquids's Conduct

 In issue three, Gulsby contends that the trial court erred in disregarding the
jury's findings that Williams (1) benefitted from Gulf Liquids's fraud, (2) was
responsible for Gulf Liquids's conduct, and (3) conspired with Gulf Liquids to
fraudulently induce Gulsby to enter the contracts. However, we have already held
that Gulf Liquids did not commit fraud, thus Williams cannot be held vicariously
liable for Gulf Liquids's fraud. Accordingly, we overrule Gulsby's third issue.

D. Punitive-Damage Awards

 In issue four, Gulsby contends the trial court erred disregarding the jury's
punitive-damage findings and setting aside the punitive-damage awards against Gulf
Liquids and Williams. Because we have held that these parties committed no
underlying tort, the trial court properly disregarded the punitive-damages awards. See
Schlueter v. Schlueter, 975 S.W.2d 584, 589 (Tex. 1998); Fed. Express Corp. v.
Dutschmann, 846 S.W.2d 282, 284 (Tex. 1993) (holding recovery of punitive
damages requires finding of independent tort with accompanying actual damages). Accordingly, we overrule issue four.



E. Testimony About the Value of Gulsby

 In its fifth issue, which is a conditional issue on appeal, Gulsby argues that if
this Court does not hold in its favor on the tort issues, the case should be nonetheless
reversed and remanded because the trial court did not permit Jerry Gulsby to testify
about the value of his company. Gulsby contends that the evidence was relevant to
show its damages as a result of Gulf Liquids's and Williams's fraud and tortious
interference.

 Erroneously excluded evidence constitutes reversible error if it is both
controlling on a material issue and not cumulative. Mentis v. Barnard, 870 S.W.2d
14, 16(Tex. 1994). Here, the excluded evidence went to the issue of consequential
damages suffered by Gulsby as a result of Gulf Liquids's and Williams's alleged
torts. However, because we have held that the trial court properly disregarded the tort
liability findings against Gulf Liquids and Williams, Gulsby's damages are not a
material issue in the case. Thus, error, if any, in not allowing Jerry Gulsby to testify
about the value of his company, is harmless.

 We overrule Gulsby's fifth issue.

F. Reducing Gulsby's Breach-of-Contract and Quantum Meruit Awards

 In its sixth issue on appeal, which is a second conditional issue, Gulsby argues
that the trial court erroneously reduced the damages awarded for both breach of
contract and quantum meruit, when only one such reduction was warranted. 
Specifically, Gulsby points out that in response to jury question 38, the jury awarded
Gulsby $9,016,682 for breach of contract, and in response to jury question 41, the
jury awarded Gulsby $7,746,077 for quantum meruit. However, both of these jury
questions included a $2 million award for Gulsby's work on the Geismar expansion. 
Thus, Gulsby asked that its judgment be reduced by $2 million so that it would not
be compensated for the Geismar expansion twice. However, when the trial court
entered judgment, it reduced both the breach-of-contract and quantum meruit awards
by $2 million--for a total reduction of $4 million.

 Gulsby contends the trial court erred in reducing its quantum meruit recovery
by $2 million. Neither Gulf Liquids nor Williams address this issue in their response
briefs. However, we have already held that Gulsby's breach-of-contract and quantum
meruit awards must be reversed, thus this issue is moot.

 We overrule Gulsby's sixth issue.

G. Attorney's Fees

 In its seventh issue on appeal, which is also its final conditional issue, Gulsby
contends the trial court erred in awarding $0 in attorney's fees on its breach-of-contract claim based on its failure to segregate its fees between its breach-of-contract
and fraud claims.

 The remedy for unsegregated attorney's fees is a new trial on the issue, not
rendition of a take-nothing judgment on the claim for attorney's fees. See Tony Gullo
Motors v. Chapa, 212 S.W.3d 299, 310-11 (Tex. 2006); Stewart Title Guar. Co. v.
Sterling, 822 S.W.2d 1, 11 (Tex. 1991). "Unsegregated attorney's fees . . . are some
evidence of what the segregated amount should be." Tony Gullo Motors, 212 S.W.3d
at 314. Because we have reversed and remanded Gulby's breach-of-contract claims 
for further proceedings, and because the testimony of the unsegregated amount
constituted some evidence of the segregated attorney's fees, we reverse the trial
court's take-nothing judgment on Gulsby's attorney's fees claims and remand for
further proceedings.

 We sustain Gulsby's seventh issue.


NAICO'S APPEAL

A. Background

 NAICO issued payment and performance bonds for Gulsby on Contracts 1 and
2. Gulf Liquids, its lender, and its insurer were the beneficiaries of the bonds issued.

In May 2001, Gulf Liquids discovered that Gulsby owed over $15 million to the
subcontractors on the Base Project and made a demand for NAICO to fulfill its
obligation on the payment bonds. NAICO initially complied and began paying the
subcontractors on behalf of Gulsby. However, in July 2001, NAICO refused to pay
under the performance bonds to ensure the completion of the project. In September
2001, Gulf Liquids terminated the contracts. NAICO sued Gulf Liquids and Williams
to recover the amounts it paid on the bonds, plus punitive damages.

B. JNOV of Tort Claims against Gulf Liquids and Williams

 In jury question number 58(2), the jury found that Gulf Liquids and Williams
fraudulently induced (4) NAICO to issue the bonds by failing to disclose a material fact. 
The jury was instructed to consider only acts or omissions by Gulf Liquids and
Williams that occurred prior to the execution of the bonds. In jury questions 61 and
62, the jury found that Williams tortiously interfered with the bonds and that its
interference was not justified. In jury questions 63 and 64, the jury found that Gulf
Liquids and Williams committed fraud against NAICO. (5) In jury question 65, the jury
found that Williams partook of the benefits arising from the fraud against NAICO. In
jury questions number 70 and 71, the jury awarded $20,182,498 in actual damages
based on the jury's tort findings. 

 The jury was then found that there was clear and convincing evidence of (1)
harm to NAICO as a result of Gulf Liquids's and Williams's fraud, and (2) malice by
Williams. Based on these findings, the jury assessed $20 million in punitive damages
against Gulf Liquids and $50 million in punitive damages against Williams.

 Nevertheless, after post-verdict motions, the trial court granted JNOV as to
these tort findings and entered judgment that NAICO take nothing on its tort claims
against Gulf Liquids and Williams. In issues one through four, NAICO appeals,
contending the trial court erred by granting JNOV on its fraud and tortious
interference claims.

 1. Standard of Review 

 A trial court may disregard a jury finding and enter a JNOV if the finding is
immaterial or if there is no evidence to support one or more of the jury findings on
issues necessary to liability. Tiller, 121 S.W.3d at 713. A trial court may grant a
motion for JNOV if a directed verdict would have been proper. Tex. R. Civ. P. 301. 

 2. Materiality

 Gulf Liquids and Williams argue that the tort questions were immaterial and
should not have been submitted to the jury. Specifically, they alleged that "if NAICO
is entitled to recoup the sums it paid, its claim is against [Gulsby] because NAICO
performed [Gulsby's] obligations to pay its subcontractors under the construction
contracts and has an indemnity agreement from [Gulsby]." Essentially, Williams and
Gulf Liquids argue that once a surety has paid on a bond, its remedy lies with the
principal, and it has no right to an independent tort claim to recover those amounts. 
Gulf Liquids and Williams also argue that fraud and misrepresentations are defenses
to a surety's liability, but do not give rise to an independent cause of action. We
agree.

 Fraud in the inducement of the underlying construction contract will serve as
a defense to a surety's liability on the bonds. See Taylor & Jennings, Inc. v. Bellino
Bros. Const. Co., 57 A.D.2d 42 , 42, 393 N.Y.S.2d 203, 205 (N.Y. App Div. 1977); 
4A Bruner & O'Connor, supra, § 12:66 (2009). Similarly, fraud or
misrepresentation by the obligee that induces the surety to issue the bond can result
in the surety's obligation being voidable. Restatement (Third) Suretyship and
Guaranty § 12 (1996); 4A Bruner & O'Connor, supra § 12:76. However,
NAICO has cited no authority holding that such fraud will serve as an independent
ground for a tort recovery for fraudulent inducement.

 Regarding post-contractual misrepresentations about the $12 million change
order, we note that if there is an alteration of a bonded contract that imposes materially
different risks, the surety may be entitled to a discharge of its obligations under the
bonds. See U.S. v. Freel, 186 U.S. 309, 317, 22 S. Ct. 875, 878 (1902); Old Colony
Ins. Co. v. City of Quitman, 352 S.W.2d 452, 455 (Tex. 1961). Regarding
misrepresentations about substantial completion, we note that performance bonds are
conditional obligations that are triggered by, among other requirements, the principal's
material breach of the bonded contract sufficient to warrant termination. See Beard
Family P'ship v. Commercial Indem. Ins. Co., 116 S.W.3d 839, 845 (Tex.
App.--Austin 2003, no pet.). If a contractor has substantially complied with a
construction contract, it cannot be said to have materially breached the construction
contract. See Vance v. My Apartment Steakhouse of San Antonio, Inc., 677 S.W.2d
480, 481 (Tex. 1984); 4A Bruner & O'Connor, supra, §§ 12:45, 5 Bruner &
O'Connor 18:12 2002 & Supp. 2010). Thus, in such a circumstance, the surety is not
liable on the bonds. See Kidd-Scruggs Co. v. Tyler Hotel Co., 270 S.W. 566, 570-71
(Tex. Civ. App.--Texarkana 1925, writ ref'd). NAICO contends that it relied to its
detriment on Gulf Liquids's and Williams's misrepresentations because, "had [it]
known that Gulf Liquids was not paying Gulsby monies it owed, NAICO could have
declared an owner default before [it paid on the bonds]." However, an "owner
default" is a defense to the surety's liability. 4A Bruner & O'Connor, supra §§
12:15, 12:69. Just as there is no authority that fraudulently inducing the issuance of
a bond will serve as an independent ground for a tort recovery, there is no authority
that fraudulently inducing one to forgo a contract defense will serve as an independent
ground for a tort recovery. Instead, NAICO cites several cases allowing a surety to
bring a professional negligence claim against an engineer hired by the owner to
oversee construction, an accountant hired by the contractor to prepare a financial
statement, and a bank hired by the contractor to disburse contract funds. (6) However,
in each of these cases, the duty breached arose out of a contract that the engineer,
accountant, or bank had with either the owner or contractor, and the courts held that,
even though not in privity, the sureties could maintain a negligence cause of action for
the breach of those contractual duties. We note that in the case against the accountant,
the duty was based on section 552 of the Restatement (Second) of Torts (1976),
which, in certain circumstances, allows third parties to sue professionals for
negligence despite a lack of privity if the professional has reason to know to know that
a nonparty to its contract will rely on its information. See Amwest Surety, 77 So. 2d
at 411-12. And, in the case against the bank, the duty was based on a particular
provision of California statutory law. See Commercial Standard Ins., 129 Cal. Rptr.
at 95-96. We are not persuaded that these cases stand for the general proposition that
a surety may, under the circumstances present in this case, seek an independent tort
recovery for damages incurred by paying on the bonds.

 We are not holding that a surety who pays under a contract has no recourse to
recoup its expenditures under the bonds. Indeed, the law of equity provides at least
three possible remedies. (7) First, the "[c]ourts have long recognized that a surety has
an equitable right to reimbursement from the principal for amounts paid on an
indemnity bond." Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276,
281 n.2 (Tex. 1998); 4A Bruner & O'Connor, supra, § 12.99 (2009). Second, to the
extent that reimbursement is not available because, as here, the principal is not in fact
liable, restitution may be available. Restatement (Third) Suretyship & Guaranty
§ 26 (1996); 4A Bruner & O'Connor, supra, § 12.99 (2009) ("Even where the
contractor has a valid defense to reimbursement of the surety for incurrence of
unreasonable costs [because the surety paid what was not owed], the surety is still
entitled to recover from the contractor, under the principle of restitution, for the
reasonable value of benefits conferred on the contractor by the surety's incurrence of
such costs."). Finally, under principles of equitable subrogation, a surety may be able
to assert its principal's contract, tort, or statutory claims against the obligee arising out
of the bonded contract. See Restatement (Third) Suretyship & Guaranty, §§
27-28; 4A Bruner & O'Connor, supra, § 12.100 (2009).

 We also note that, in addition to these three possible equitable remedies, the
parties may contractually provide for indemnification. Because many jurisdictions
require sureties to prove that the principal was in fact liable before recovering
reimbursement, sureties were reluctant to settle claims with the obligee until the
principal's liability was determined. Associated. Indem. Corp., 964 S.W.2d at 281 n.2. 
To prevent the risk that reimbursement would not be available in the event that the
surety paid and its principal was later determined not to be in default, many sureties
obtained indemnity agreements with their principals, "under which the surety may
obtain reimbursement for settlement amounts paid in good faith, regardless of whether
the principal is ultimately determined to be liable to the obligee." Id. In fact, in this
case, there is such an indemnity agreement between NAICO and Gulsby, wherein
Gulsby states that its liability to NAICO "shall extend to and include all amounts paid
by surety in good faith under the belief that (1) surety was or might be liable therefore;
(2) such payments were necessary or advisable to protect any of surety's rights or to
avoid or lessen surety's liability or alleged liability." Thus, NAICO has a contractual
right to recover its expenditures from Gulsby to the extent that those amounts were
paid in good faith belief that they were owed. As noted by the supreme court in
Associated Indem. Corp. v. CAT Contracting, this practice promotes the practice of
settling claims against the bonds without the necessity for litigation to first determine
the principal's liability. See id. 

 In light of the contractual and equitable remedies available to NAICO, and the
lack of clear authority permitting the type of tort suits alleged in this case, we hold that
the trial court did not err by disregarding the jury findings on NAICO's tort claims.

 We overrule issues one through four.

C. Breach of Contract

 In jury question 44, the jury found that Gulf Liquids materially altered Contracts
1 and 2 and that NAICO did not consent to the alteration. In jury questions 46 and 47,
the jury found that Gulf Liquids committed an "owner default" of the contract that was
not excused. Based on these questions, the jury found that NAICO had been damaged
in the amount of $20,182,498.53. Nevertheless, the trial court granted JNOV,
disregarded these findings, and rendered judgment that NAICO take nothing on these
breach-of-contract claims. In issues five and six, NAICO contends the trial court erred
in disregarding these findings.

 Gulf Liquids responds that it did not breach the bonds, and that "the bonds at
most provided NAICO with a defense to its obligations to Gulf Liquids." We agree. 
It is true that an "owner default" by nonpayment is a defense to the surety's liability. 
See Roel P'ship v. Amwest Sur. Ins. Co., 258 A.D.2d, 780, 781-82, (N.Y. App. Div.
1999) (holding owner's default for failing to pay contractor according to the contract
is defense to surety's liability); 4A Bruner & O'Connor, supra §§ 12:15, 12:59,
12:72. Likewise, "a material alteration" is a defense to the surety's liability. See
Vastine v. Bank of Dallas, 808 S.W.2d 463, 464-65 (Tex. 1991); 4A Bruner &
O'Connor, §12:70. However, again NAICO cites no cases holding that either an
"owner default" or a "material alteration" will support a direct claim for damages
against the owner by the surety.

 In light of the contractual and equitable remedies available to NAICO, and the
lack of clear authority permitting a surety to assert a direct claim for damages against
the owner as a result of an "owner default" or "material alteration," we hold that the
trial court did not err by disregarding the jury damage awards in jury questions 48 and
49 on NAICO's breach of contract claims.

 We overrule issues five and six.

D. Declaratory Judgment

 In issue seven, NAICO argues that the trial court erred by disregarding jury
question 46, in which the jury found that Gulf Liquids committed an "owner default." 
Specifically, NAICO argues that the existence of an "owner default" was established
by the jury's finding in question 27a that Gulf Liquids had breached Contracts 1 & 2. 
We agree. The bonds defined an "owner default" as a "[f]ailure of the Owner, which
has neither been remedied nor waived, to pay the Contractor as required by the
Construction Contract . . . ." We have already held that Gulf Liquids breached the
contracts by failing to pay Gulsby, thus an "owner default" has been established.

 Even though we have held that NAICO cannot affirmatively recover damages
based on a jury finding that Gulf Liquids committed an "owner default," it can assert
the "owner default" finding as a defense to its liability. NAICO also requested a
declaratory judgment that its obligations on the bond were discharged because of an
"owner's default." Jury findings 27a (regarding Gulf Liquids's breach of contract to
pay) and 44 (regarding "owner default") support NAICO's claim for a declaratory
judgment. Therefore, we sustain NAICO's seventh issue. We reverse the judgment
denying NAICO's request for a declaratory judgment, and render judgment declaring
that NAICO's liability on the bonds is discharged because of an "owner's default."

E. Punitive-Damage Awards

 In issue eight, NAICO contends the trial court erred disregarding the jury's
punitive-damage findings and setting aside the punitive-damage awards against Gulf
Liquids and Williams. Because we have held that these parties committed no
underlying tort, the trial court properly disregarded the punitive-damages awards. See
Schlueter, 975 S.W.2d at 589;Fed. Express Corp., 846 S.W.2d at 284 (holding
recovery of punitive damages requires finding of independent tort with accompanying
actual damages). 

 Accordingly, we overrule issue eight.

F. Attorney's Fees


 In its ninth issue, NAICO, like Gulsby, contends the trial court erred in
awarding $0 in attorney's fees on its declaratory judgment claim based on NAICO's
failure to segregate its fees in its declaratory judgment and breach-of-contract claims
and from its fraud and tortious interference claims. 

 The remedy for unsegregated attorney's fees is a new trial on the issue, not
rendition of a take-nothing judgment on the claim for attorney's fees. See Tony Gullo
Motors, 212 S.W.3d at 310-11; Stewart Title, 822 S.W.2d at 11. "Unsegregated
attorney's fees . . . are some evidence of what the segregated amount should be." Tony
Gullo Motors, 212 S.W.3d at 314. Because the testimony of the unsegregated amount
constituted some evidence of the segregated attorneys' fees, we reverse the trial
court's take-nothing judgment on NAICO's attorneys' fees claims and remand for
further proceedings.

 We sustain NAICO's ninth issue on appeal.

DISPOSITIONS


A. Conclusion Regarding Gulf Liquids's Appeal

 Having determined that the trial court erred in submitting benefit-of-the-bargain
damages to the jury, we reverse the breach-of-contract award in Gulsby's favor and
remand for further proceedings. See Tex. R. App. P. 44.1(b). Having determined that
the trial court erred by submitting quantum meruit claims to the jury because they were
covered by the contracts, we reverse the quantum meruit award and render judgment
that Gulsby take nothing on its quantum meruit claims.

B. Conclusion Regarding Gulsby's Appeal

 We affirm the trial court's granting of JNOV, disregarding of the jury's tort
findings, and rendering judgment that Gulsby take nothing on its tort claims against
Gulf Liquids and Williams. We also hold that, error, if any, in refusing to permit Jerry
Gulsby to testify about Gulsby's value before the contracts were signed, was harmless. 
Finally, we hold that the trial court erred in awarding Gulsby $0 in attorney's fees on
its breach-of-contract claim. In light of these holdings, we affirm the take-nothing
judgment for Gulsby on its tort claims and reverse and remand its attorney's fees
claims for further proceedings.

C. Conclusion Regarding NAICO's Appeal

 We affirm the trial court's granting of JNOV, disregarding of the jury's tort
findings, and rendering judgment that NAICO take nothing on its tort claims against
Gulf Liquids and Williams. We reverse the judgment denying NAICO's request for
declaratory relief, and render judgment declaring that NAICO is discharged from its
obligations on the bonds. We reverse the trial court's judgment awarding NAICO $0
in attorney's fees and remand its attorney's fees claim for further proceedings.

 


 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justices Bland and Massengale.

1. 
 
 
 
 
 
2. " " " 
 
 
 
 ''" 
 " 
 
 " 
3. 
4. 
 
 
 
5. - 
 
 
 
6. ' 
 
- 
 - 
7.