**II DEERFIELD LIMITED PARTNERSHIP, Appellant/Cross–Appellee,**

v.

**HENRY BUILDING, INC., Appellee/Cross–Appellant.**

**No. 04–00–00186–CV.**

Court of Appeals of Texas, San Antonio.

March 7, 2001.

---

Mark A. Hendrix, Sewell and Anderson, Robert C. Wendland, Vial, Hamilton, Koch & Knox, L.L.P., Dallas, for Appellant.

Roderick J. Regan, Matthews & Branscomb, P.C., San Antonio, J. Robert Arnett, Jamil N. Alibhai, Sopuch Nouhan Higgins & Arnett, Dallas, for Appellee.

Before HARDBERGER, Chief Justice, LÓPEZ, Justice, ANGELINI, Justice.

## OPINION

PHIL HARDBERGER, Chief Justice.

II Deerfield Limited Partnership ("Deerfield") appeals a judgment in favor of Henry Building, Inc. ("Henry Building") based on a jury's finding that Deerfield breached a settlement agreement. Deerfield presents five issues in its brief, contending: (1) the evidence is legally and factually insufficient to support the jury's finding that Deerfield breached the settlement agreement; (2) Deerfield was excused from performance by Henry Building's breach of the settlement agreement; (3) Deerfield is entitled to a credit for monies paid to subcontractors and suppliers under the doctrine of equitable subrogation; (4) Deerfield made a perfect tender, precluding recovery of attorney's fees; and (5) the trial court erred in excluding evidence of the prior criminal convictions of Tom Gaubert, an employee of Henry Building. Henry Building filed a cross-appeal, claiming that the trial court erred in reducing the jury's verdict by $31,500. We overrule each of Deerfield's issues but sustain the issue raised by Henry Building in its cross-appeal. Accordingly, we reverse that portion of the trial court's judgment reducing the jury's verdict by $31,500 and render judgment for the full amount of damages awarded by the jury, and we affirm the remainder of the trial court's judgment.

### BACKGROUND

On June 6, 1997, Deerfield and Henry Building entered into a construction contract. Henry Building agreed to perform the services of general contractor in connection with the construction of a 149 unit apartment project known as Phase II Deerfield Apartments. Discord developed between the parties, resulting in a lawsuit being filed by Henry Building against Deerfield. The parties were ordered to mediation and entered into a settlement agreement on November 12, 1997.

Paragraph 3 of the settlement agreement, entitled "Final Contract Payment by Deerfield," required Deerfield to pay Henry an amount equal to (A) the contract sum ($6,650,000) multiplied by the total appropriate percentage of work completed on the project by Henry Building pursuant to the construction contract on the "Transition Date" (plus or minus all approved change orders); less (B) all payments previously made to Henry Building by Deerfield and statutory retainage. The parties agreed that the exact amount of work performed by Henry Building would be determined by an audit to be conducted by three architects: (1) the project architect

that had been retained by Deerfield; (2) an architect to be appointed by Henry Building; and (3) the architect that had been retained by Deerfield's lender, Steve Sawyer. The settlement agreement stated, "The majority vote of the Architects shall be binding." The percentage of work completed was required to take into account the cost of repair or diminished value of any work that was not performed in conformity with the contract's plans and specifications.

Paragraph 4 of the settlement agreement, entitled "Deadline for Final Contract Payment Audit," stated, "The Final Contract Payment Audit shall be conducted by the Architects on or about November 18, 1997 (the 'Transition Date')." Paragraph 5 required Deerfield to deliver the Final Contract Payment to Henry Building within ten business days after Deerfield received: (1) the Final Contract Payment Audit from the Architects; (2) an appropriate AIA Application and Certification for Payment from Henry incorporating the Final Contract Payment Audit; and (3) funding of said application by Deerfield's lender.

In addition to the Final Contract Payment, the settlement agreement also required Deerfield to pay Henry Building its retainage, less all withholding required by law or the settlement agreement, on December 18, 1997. Deerfield also agreed to pay Henry Building the sum of $106,276.03 (the "Interim Payment") on or before November 17, 1997, in joint checks to Henry Building and the subcontractors listed on an exhibit attached to the settlement agreement.

Henry Building agreed to use its best efforts to assign Deerfield the contracts between Henry Building and its subcontractors and suppliers. Henry Building also agreed to assign all building permits, completion reports, plans and warranties and to release all mechanics liens. Finally, Henry Building agreed to dismiss the lawsuit against Deerfield on or before the Transition Date.

After a trial on the merits, a jury found that Deerfield failed to comply with the settlement agreement and Deerfield's failure to comply was not excused. The jury further found that Henry Building also failed to comply with the settlement agreement but Henry Building's failure to comply was excused. The jury found that Henry Building was entitled to $110,786 in retainage and $240,738.54 for work completed and not paid for.[1] The jury further awarded Henry Building $260,000 in attorneys' fees for preparation and trial, $25,000 in additional attorneys' fees for an appeal to the court of appeals, and $12,500 in additional attorneys' fees for an appeal to the Texas Supreme Court. After the jury's verdict, the trial court granted Deerfield's motion for judgment notwithstanding the verdict in part, ordering that the amount of damages for work completed and not paid for be reduced by $31,500 because Henry Building was not entitled to recover any amount for "general conditions." The trial court then entered judgment in favor of Henry Building for

---

1. Jury Charge Question No. 3, as answered by the jury, stated:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Henry for its damages, if any, that resulted from such failure to comply with the terms of the settlement agreement? Do not add any interest on damages, if any.

> Answer in dollars and cents for damages, if any, for each of the following elements of damage:

| | |
|---|---|
| Retainage owed to Henry | Answer: $110,786 |
| For work completed and not paid for as reviewed by the architecture committee. | Answer: $240,738.54 |

$320,024.54, plus interest, attorneys' fees and costs.

## BREACH OF SETTLEMENT AGREEMENT

### A. Standard of Review

■ In considering a "no evidence" or legal sufficiency point raised by the party without the burden of proof, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *See Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). If more than a scintilla of evidence is offered on a fact, the evidence is legally sufficient. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

■ When the party with the burden of proof challenges the legal sufficiency to support the jury's failure to find in its favor, it must show that no evidence supports the failure to find and the evidence establishes the desired finding as a matter of law. *Merckling v. Curtis*, 911 S.W.2d 759, 763 (Tex.App.—Houston [1st Dist.] 1995, writ denied). In conducting our review, we must first determine that no evidence supports the finding based on an examination of the record for evidence supporting the finding, while ignoring all evidence to the contrary. *See id.* If there is no evidence to support the finding, then we examine the entire record to determine whether the contrary proposition is established as a matter of law. *See id.*

■ Only one standard of review is used in reviewing factual sufficiency challenges, regardless of whether the court of appeals is reviewing a negative or affirmative jury finding or whether the complaining party had the burden of proof on the issue. *Id.* In reviewing a factual sufficiency complaint, we must examine all of the evidence, and we only set aside the verdict if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Id.* We cannot merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Id.*

### B. Breach of Settlement Agreement by Deerfield

■ In its first issue, Deerfield contends that the evidence is legally and factually insufficient to support the jury's finding that Deerfield breached the settlement agreement. Deerfield asserts that the three requirements that had to be met before it was obligated to pay the Final Contract Payment were conditions precedent, and, since the conditions precedent were not satisfied, it was not obligated to pay the Final Contract Payment. Henry Building responds that the three requirements are contractual covenants, not conditions precedent. Henry Building further contends that Deerfield breached the settlement agreement by preventing the architects from meeting and determining the final contract amount.

■ A condition precedent may be either a condition to the formation of a contact or to an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976); *Marsh v. Marsh*, 949 S.W.2d 734, 743 (Tex.App.—Houston [14th Dist.] 1997, no pet.). Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d at 3; *Marsh v. Marsh*, 949 S.W.2d at 743–44. While no particular words are necessary for the existence of a condition, such terms as "if," "provided that," "on condition

that," or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d at 3; *Marsh v. Marsh*, 949 S.W.2d at 744. In the absence of such a limiting clause, whether a contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d at 3; *Marsh v. Marsh*, 949 S.W.2d at 744. Because of their harshness in operation, conditions are not favored, and courts are inclined to construe the provisions in a contract as covenants rather than as conditions. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d at 3; *Marsh v. Marsh*, 949 S.W.2d at 744.

In this case, paragraph 3 of the settlement agreement expressly obligated Deerfield to make a Final Contract Payment. For this reason, Henry Building argues that the requirements in paragraph 5 that needed to be met prior to such payment should be construed as covenants relating to the "terms of payment" or "manner of payment" or "timing of payment," not as a condition precedent to Deerfield's obligation to pay. *See, e.g., Graco Robotics, Inc. v. Oaklawn Bank*, 914 S.W.2d 633, 640–41 (Tex.App.—Texarkana 1995, writ dism'd); *Gulf Const. Co. v. Self*, 676 S.W.2d 624, 627–28 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.); *Prickett v. Lendell Builders, Inc.*, 572 S.W.2d 57, 59 (Tex.Civ.App.—Eastland 1978, no writ).

We do not find it necessary to determine whether the architects' determination of the percentage completion was a covenant or a condition precedent. "It is elementary that one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is made to depend

cannot avail himself of its nonperformance." *Rich v. McMullan*, 506 S.W.2d 745, 747 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.). Similarly, when a party to a contract fails to perform a contractual covenant or obligation, he may not thereafter enforce the remaining terms of the contract. *Graco Robotics, Inc. v. Oaklawn Bank*, 914 S.W.2d at 641. Therefore, if the jury properly found that Deerfield interfered with the architects' audit, preventing them from determining the percentage of work Henry Building completed, Deerfield's actions would constitute a failure to comply with the contract.

On the transition date, as defined in the settlement agreement, each of the architects arrived at the construction site. Jim Sealy, the architect appointed by Henry Building, arrived first and walked the construction site. When the other architects arrived, Sealy introduced himself and indicated that he would be ready to meet with them when they finished their review of the site. An hour after Sealy had introduced himself to the architects, he noticed that they were standing near the front of the site with Deerfield's owner, Dale Bullough, and two Deerfield employees, Scott Farley and Rick Landerholm. Sealy approached the group and asked when they intended to meet and begin the audit. Farley told Sealy that there was not going to be a meeting. Deerfield's owner then invited the other two architects to have lunch, excluding Sealy. Sealy informed one of Henry Building's employees, Tom Gaubert, about what had occurred. Gaubert phoned Henry Building's attorney, who instructed Gaubert and Sealy to have lunch while he made some phone calls. When Sealy returned to the site, he was unable to locate the other architects. Sealy approached Landerholm who informed him that Deerfield's owner had dismissed the other architects, and they had left the

site. Sealy stated that it was critical that the meeting occur on the transition date, because construction was continuing and the audit needed to take into account the work completed as of that date. In order to come to an agreement, the architects needed to be on-site to review the areas in which they disagreed regarding the percentage completion. Being on-site would enable the architects to show each other how they reached their calculation so that they could convince the other architects of their position or could be shown that their own position was incorrect or needed to be modified. The meeting never took place.

As a result of Sealy's phone call, Henry Building's attorney faxed a letter to Deerfield's attorney. The letter stated that Bullough and Farley had disrupted the architectural audit by precluding Sealy from conferring with Sawyer and Kelly, insisting that independent reports be submitted, declaring the audit over, and departing the site with the other two architects. The letter demanded that Sawyer and Kelly return to the site so the architects could meet and make their decision by majority vote.

Steve Sawyer, the lender's architect, testified that he was extremely reluctant to participate in the audit. However, he testified that based on his conversations with the lender, he agreed to participate in the meeting. Upon arriving at the site, Sawyer recalled a general discussion about the three architects meeting to determine the percentage completion. Sawyer stated that he was not concerned about the discussion regarding the meeting because he was not going to participate in a three-party meeting or discussion. After Sawyer finished reviewing the site, he went to the lunch offered by Bullough. Sawyer recalled Bullough asking for his percentage completion figure, but Sawyer told Bullough he had to return to

his office and review additional documents before reaching a figure. Sawyer stated that he did not recall any efforts being made to organize a follow-up meeting. After Sawyer submitted his report containing his percentage completion calculation, Sawyer recalled being contacted by Sealy with additional information to consider. On January 19, 1998, Sawyer revised his percentage completion figure based on some of the information provided.

Jim Kelly, the project architect, testified that he and Sealy discussed a meeting on November 18, 1997, and that he expected to meet with Sealy and Sawyer. However, Farley subsequently stated that no meeting was to occur. Kelly ignored subsequent efforts by Sealy to contact him, resulting in Henry Building's attorney sending a letter to Deerfield's attorney on December 3, 1997, noting the difficulty Sealy was having in reaching Kelly.

Dale Bullough, Deerfield's owner, testified that he had invited Sawyer and Kelly to lunch. Bullough stated that he told his employee, Farley, that Henry Building's employee, Tom Gaubert, was not invited to the lunch. Bullough further stated that if Farley thought Sealy was not invited, that also was fine. During lunch, Bullough asked Farley to discuss his concerns with the work Henry Building had performed. He also asked the two architects for their percentage completion figures. Both architects told Bullough they would have to study additional documentation and let him know.

Farley testified that he saw each of the architects arrive at the site. Although Farley testified that Sawyer told him that he would not meet with anyone, he did not report this to the other architects. Farley stated that after Sawyer finished his inspection, he reminded him about lunch, and Sawyer went to the luncheon location

next door. When Farley noticed Kelly finishing his inspection, he saw Sealy approaching Kelly, so Farley moved to join the group. When he arrived, he overheard Sealy tell Kelly something about the architects meeting. Farley informed Kelly that lunch was ready and informed Sealy that he was not invited. Farley further informed Sealy that there would be no meeting. During lunch, Farley described the work that Henry Building performed that he believed needed to be repaired, and Bullough then asked Sawyer and Kelly for their percentage completion figures. Bullough informed Sawyer and Kelly that he believed that the project was not over 20% complete. On December 2, 1997, Farley sent Kelly a letter detailing the problems with Henry Building's work and concluding that the percentage completion figure should not exceed 20%.

The contract required a final contract payment audit to be conducted on November 18, 1997. This was Henry Building's last day on the site. Since the percentage of work completed was to be determined on that date by a majority vote, the jury could have found that a meeting was required to occur at which time the majority would vote. The jury also could have determined that Deerfield prevented that meeting from occurring, thereby breaching a covenant or making the performance of a condition precedent impossible. Although Sawyer testified that he would not have met with the other architects, Sawyer never told Sealy that he would not meet on November 18, 1997, because Deerfield precluded any possible meeting. Although Sawyer was initially reluctant to participate in the audit at all, the lender required him to participate. The jury could have inferred that the lender also would have required Sawyer to participate in a meeting over his objection if such a meeting had been held. Deerfield's first issue is overruled.

## C. Performance by Henry Building Excused

■ In its second issue, Deerfield contends that no evidence supports the jury's finding that Henry Building's failure to comply with the settlement agreement was excused. Deerfield asserts that Henry Building breached the settlement agreement "in myriad ways and thereby excused Deerfield from performing any obligations thereunder." Specifically, Deerfield contends Henry Building breached the settlement agreement by: (1) its architect's refusal to conduct an independent audit and failure to respond to the efforts of the project architect to communicate with him; (2) causing its attorney to declare the audit over within minutes of lunch being served by Deerfield; (3) rejecting Deerfield's offer to pay based on a 21% completion figure; (4) interfering with subcontractors and suppliers; (5) submitting an application for payment that failed to incorporate the findings of the architects; (6) filing a false and malicious lien; and (7) failing to dismiss the original suit on or before November 18, 1997. Henry Building responds that its performance was excused by Deerfield's initial breach of the settlement agreement.

The jury charge instructed the jury that Henry's failure to comply would be excused if: (1) Deerfield previously failed to comply with a material obligation of the settlement agreement; (2) Deerfield previously repudiated the settlement agreement; or (3) Henry's failure to comply was waived by Deerfield. The jury was further instructed that a party repudiates an agreement when "it indicates, by its words or actions, that it is not going to perform its obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the

agreement." The jury was also instructed that waiver is "an intentional surrender of a known right or intentional conduct inconsistent with claiming the right."

We have previously determined that Deerfield breached the agreement when it prevented the architects' meeting on November 18, 1997. The jury's finding that Henry's failure to comply was excused is supported by the same evidence that supports the jury's finding that Deerfield breached the agreement. *See Graco Robotics, Inc. v.. Oaklawn Bank,* 914 S.W.2d at 641 (breach by other party excuses performance by non-breaching party). The jury could have rejected Deerfield's argument that Sealy failed to conduct an audit based on Sealy's explanation of how he proceeded and his actions in attempting to have the architects meet on November 18, 1997. The only other breach by Henry Building that potentially occurred during the same period of time that the audit was to occur was the dismissal of the lawsuit. The settlement agreement stated that the lawsuit would be dismissed on November 18, 1997. Henry explained that the lawsuit was not dismissed because Deerfield had already breached the agreement by interfering with the audit. Deerfield's second issue is overruled.

### CREDITS FOR SUBCONTRACTORS AND REDUCTION OF VERDICT FOR GENERAL CONDITIONS

■ In its third issue, Deerfield complains that it is entitled to the monies disbursed to the subcontractors under the doctrine of equitable subrogation. "The doctrine of equitable subrogation is given a liberal application and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter." *Ma-tagorda County v. Texas Ass'n of Counties County Gov't Risk Mgmt. Pool,* 975 S.W.2d 782, 786 (Tex.App.—Corpus Christi 1998), *aff'd,* 2000 WL 1867945 (Tex. Dec.21, 2000). Henry Building asserts that before Deerfield is entitled to invoke the doctrine of equitable subrogation, it must prove that it paid a debt for which Henry Building was primarily liable. Since the jury gave Deerfield a proper credit for those amounts shown by the evidence to have been paid on Henry Building's behalf, Henry Building responds that Deerfield is not entitled to any additional credit.

■ In the cross-appeal, Henry Building challenges the trial court's decision to grant a judgment notwithstanding the verdict as to $31,500 of damages awarded by the jury. A judgment notwithstanding the verdict is reviewed under a legal sufficiency standard of review. *Guzman v. Synthes (USA),* 20 S.W.3d 717, 719 (Tex.App.—San Antonio 1999, pet. denied). The trial court accepted Deerfield's argument that Henry Building was not entitled to any additional payment for "general conditions;" therefore, the trial court reduced the jury's damage award by the $31,500 that Henry Building argued it was entitled to receive for general conditions.

■ The fundamental problem underlying both of these issues is that the jury reached a general verdict awarding Henry Building $110,786 for retainage, and $240,738.54 for work completed and not paid for. We cannot determine from this general verdict what credits were given for payments to subcontractors. The jury could have sifted through the evidence and given full or partial credit based on whether they believed Deerfield had made the payment on Henry Building's behalf. Similarly, we do not know that the jury awarded $31,500 for general conditions. In fact, we do not know what amounts the jury

awarded for any given line item of the payment application. The jury could have chosen figures from any of the three architects' reports and mixed and matched based on the documented problems in the field observation notes. Although Deerfield argues in its brief that the jury's damage award was necessarily based on Sawyer's percentage completion figure, in view of Henry Building's closing argument, this argument is not supported by the record. The amount requested by Henry Building during closing argument is not the amount the jury awarded. Even if we were to sift through the evidence and independently calculate a number that matched the jury's verdict, this would be improper. Since the jury rendered a general damage amount, neither this court nor the trial court can evaluate the evidence to support an individual line item that could or could not have been added in determining the general amount. *See Excel Corp. v. Porras,* 14 S.W.3d 307, 314 (Tex. App.—Corpus Christi 1999, pet. denied); *Pitman v. Lightfoot,* 937 S.W.2d 496, 524 (Tex. App.—San Antonio 1996, writ denied). Since Deerfield did not challenge the evidence to support the overall damage award, its third issue is overruled. In addition, since there is evidence to support the general damage award, the trial court erred in granting the judgment notwithstanding the verdict because we cannot determine whether the jury actually awarded $31,500 for general conditions. Henry Building's issue raised in its cross-appeal is sustained.

### ATTORNEY'S FEES

In its fourth issue, Deerfield contends that Henry Building was not entitled to receive attorneys' fees because Deerfield had made a perfect tender prior to trial. Deerfield contends that the jury, in reaching its damage award, had to accept Sawyer's percentage completion figure. Since Deerfield had offered to pay Henry Building based on Sawyer's percentage prior to trial, Deerfield contends that it made a perfect tender. Henry Building responds that the offer was conditional and did not include any amount for retainage or for the subsequent adjustments Sawyer made to the 21% figure in January of 1998.

■ Under section 38.002(3) of the Texas Civil Practice and Remedies Code, in order to recover attorneys' fees, "payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim was presented." TEX. CIV. PRAC. & REM.CODE § 38.002 (Vernon 1997). Even if we were to accept that Deerfield's offer was a perfect tender of the final contract payment amount, Deerfield never offered to tender the retainage that the jury found was owed to Henry Building; therefore, the award of attorneys' fees does not violate section 38.002(3).

### GAUBERT'S CRIMINAL CONVICTIONS

■ In its fifth issue, Deerfield contends that the trial court erred in excluding evidence of the criminal convictions of Tom Gaubert, an employee of Henry Building. During the pre-trial hearing of the motions in limine, Deerfield requested that it be permitted to introduce evidence that Gaubert had been convicted of fraud, wire fraud, money laundering, preparing fraudulent records and making a false oath. Deerfield contended that the prior convictions were relevant because Gaubert was the person who was responsible for handling the finances for Henry Building on the project and preparing the draw applications. Henry Building responded that the convictions were unrelated to the underlying dispute and would be prejudicial.

"Whether to admit or exclude evidence is within the trial court's sound discretion." *National Liability & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527–28 (Tex. 2000). On appeal, we review a trial court's evidentiary decisions under an abuse of discretion standard. *Id.*

Assuming that the evidence of the criminal convictions was admissible for some purpose, the trial court could still exclude the evidence if its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tex.R. Evid. 403. In this case, Gaubert never testified. Although Gaubert prepared the draw applications, Henry testified that he reviewed the draw applications, and Pineda testified that she provided information that was included in the draw applications. Each of the draw applications were also reviewed by Sawyer, who advised the lender on the amount it should fund. Although Sawyer recommended some reduction in the amounts requested in the draw applications, this is not uncommon in the industry, and there was no allegation that any of the draws were fraudulent. The final draw application was reviewed both by Henry and Sealy. Since the percentage completion figures were based on the architects' determinations from their independent inspections and review of documentation, the trial court could have determined that evidence of Gaubert's criminal convictions would confuse or mislead the jury. Accordingly, the trial court did not abuse its discretion in excluding the evidence of the prior criminal convictions.

### Conclusion

That portion of the trial court's judgment reducing the jury verdict by $31,500 is reversed and judgment is rendered that Henry Building recover the full amount of the jury's verdict. The remainder of the trial court's judgment is affirmed.