

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00159-CV

**AME & FE INVESTMENTS, LTD.**,
Appellant

v.

**NEC NETWORKS, LLC**, d/b/a CAPTURERX,
Appellee

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2012CI11952
Honorable David A. Canales, Judge Presiding

Opinion by: Lori Massey Brissette, Justice

Sitting: Rebeca C. Martinez, Chief Justice
Lori I. Valenzuela, Justice
Lori Massey Brissette, Justice

Delivered and Filed: September 24, 2025

AFFIRMED

In this contract dispute spanning more than a decade, we are asked to weigh in for a third

time.[1] In our most recent opinion, we (1) reversed the portion of the trial court's March 10, 2017

---

[1] *See AME & FE Investments, Ltd. v. NEC Networks, LLC* (*AME II*), No. 04-17-00332-CV, 2019 WL 286121 (Tex. App.—San Antonio Jan. 23, 2019, no pet.) (mem. op.) (affirming in part, reversing and rendering in part, and reversing and remanding NEC's request for specific performance to trial court for determination of amount to be paid pursuant to certain notes); *AME & FE Investments, Ltd. v. NEC Networks, LLC* (*AME I*), 582 S.W.3d 294 (Tex. App.—San Antonio 2017, pet. denied) (granting motion challenging trial court's order setting security and remanding to trial court for entry of order consistent with opinion).

judgment granting appellee NEC Networks, LLC's request for specific performance and vacating appellant AME & FE Investments, Ltd.'s liens and security interests and (2) remanded "to the trial court for a determination of the amount to be paid by NEC to AME pursuant to the Convertible Promissory Notes dated February 27, 2009 and September 1, 2009." *AME II*, 2019 WL 286121, at *18. On remand, the trial court ordered NEC to pay $1,507,916.67. AME appeals again, arguing the trial court erred in its determination of the amount. Based on the law and the record, we affirm.

**BACKGROUND**

### A. Facts

The facts of this case are well-established and outlined in our prior opinions. Pursuant to a Note Purchase Agreement (NPA), AME loaned NEC $500,000 on February 27, 2009 (Note 1) and $1 million on September 1, 2009 (Note 2), both loans being secured by liens on NEC's property. AME had the option of converting the principal amounts due into an equity interest in NEC on or before the Maturity Date of October 1, 2011. AME did not exercise its conversion option prior to that date. Thus, per the NPA, NEC's Maturity Date for purposes of repayment of the Notes became March 29, 2012, 180 days after the October date. While NEC asked for a payoff letter stating the final amount due, informing AME that it had been approved for a new loan that would enable NEC to pay off the Notes held by AME, AME did not provide a letter until after the March 29th Maturity Date. In the payoff letter, dated March 28th but sent on April 2nd, AME stated that NEC would owe an additional per diem charge of $409.84, or a monthly interest payment of $12,500, if the Notes were not paid by the March 29th Maturity Date. NEC continued to make such payments, and AME continued to accept them, until November 19, 2012 when NEC tendered a cashier's check for $1,507,916.67 in payment of the outstanding loan principal plus accrued interest. AME, however, refused to accept the tender or to release its liens on NEC's property.

## B. Trial Court Proceedings

In July 2012, before the November 2012 tender, NEC filed suit against AME asserting claims for breach of contract and seeking a declaratory judgment that AME's option to convert the loan into an equity interest had expired. AME filed counterclaims for breach of contract, fraud, and fraudulent transfer. The trial court granted summary judgment to NEC, finding that AME breached the contract by refusing to accept NEC's payoff tender and refusing to release its liens. The trial court also granted summary judgment in favor of NEC on AME's counterclaims for breach of contract and for specific performance. The jury then found that (1) AME breached the contract first, (2) AME's breach was not excused by a prior breach by NEC, but (3) NEC did breach the contract by failing to pay off the Notes by April 3, 2012 (providing a grace period). The jury awarded $6,000 to NEC but refused to award attorney's fees. NEC then moved for specific performance, requesting that AME's liens be vacated, which request was granted by the trial court.

## C. Prior Appeal

In the prior appeal of the trial court's judgment, we recognized that AME chose repayment by failing to exercise its conversion option, that AME acknowledged NEC's ability to make repayment after the contractual deadline, and that AME accepted NEC's post-deadline interest payments. We affirmed the jury's finding that AME breached its contracts by failing to accept the payoff tender and the finding that AME's breach was not excused. We, however, reversed the judgment of $6,000 against AME, sustaining AME's legal sufficiency challenge to the damage award. We also held the trial court erred by granting the equitable remedy of specific performance to NEC, vacating AME's liens, without requiring NEC to perform its repayment obligations under the Contract. *AME II*, 2019 WL 286121, at \*12 (citing *DiGuiseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008). While AME urged us to modify the trial court's judgment to award it

$1,511,855.25, we refused to do so. Instead, we remanded the matter to the trial court to determine the amount NEC must pay under the Contract to support the award of specific performance, specifically noting that the trial court was required to take into account the interest payments made by NEC after the March 29th Maturity Date. *Id.* at *2, 17–18.

## D. Trial on Remand

On remand, NEC argued that the amount it must pay to obtain specific performance is $1,507,916.67, asserting as this court did in its prior opinion, that AME's asserted amount due of $1,511,855.25 did not account for interest payments made by NEC between March and November of 2012. AME argued that it was entitled to the principal and interest owed on the Notes as well as all actual expenses of collection, court costs, and reasonable attorney's fees. On May 4, 2023, the trial court held the remand trial. The parties included as exhibits R-1 to R-6, respectively, the NPA, the Notes, the security agreement, AME's payoff letter, and NEC's November 2012 tender letter which was accompanied by a cashier's check for $1,507,916.67. On December 6, 2023, the trial court issued a final judgment on remand ordering NEC to pay AME $1,507,916.67 pursuant to the Notes to support NEC's award of specific performance vacating AME's liens.

On January 24, 2024 the trial court issued its findings of fact and conclusions of law.[2] Specifically, the trial court found that NEC is required, pursuant to the Notes, to pay AME

---

[2] AME contends the trial court erred when it failed to enter additional findings of fact and conclusions of law. *See* TEX. R. CIV. P. 298 (allowing request for additional findings or conclusions). But, a "trial court is only required to make additional findings on ultimate issues; additional findings that relate to an evidentiary point are improper." *Villarreal v. Guerra*, 446 S.W.3d 404, 414 (Tex. App.—San Antonio 2014, pet. denied). Only where the trial court's erroneous action or refusal to act prevents the proper presentation of a case to the court of appeals are we hindered in ruling when a trial court fails to make additional findings. *See* TEX. R. APP. P. 44.1(a); *Villarreal*, 446 S.W.3d at 414. Because the amount to be paid was the lone issue presented on remand, and because the trial court's decision is apparent, AME was not prevented from adequately presenting its arguments on appeal. *See Maxwell v. Maxwell*, No. 14-20-00298-CV, 2021 WL 4956881, at *17 (Tex. App.—Houston [14th Dist.] Oct. 26, 2021, pet. denied) (mem. op.) (additional findings not required where trial court "properly and succinctly . . . apprise[s] [party] of adequate information for [] preparation of his or her appeal" (*quoting Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 386 (Tex. App.—Fort Worth 2002, pet. denied))). Further, because Judge Canales retired before providing additional findings, AME contends it was entitled to a new trial, citing *Rich v. Olah*, 274 S.W.3d 878 (Tex.

$1,507,916.67 and that NEC has been ready, willing and able to perform at all relevant times. The court further concluded that NEC is required to pay the outstanding principal and accrued but unpaid interest owing as of November 19, 2012, when it tendered payment to AME. It concluded NEC is not required to pay interest after November 19, 2012 and is not required to pay attorney's fees, lien protection costs, collection costs, court costs, or interest upon those amounts. Finally, the trial court ordered that, upon payment by NEC, all liens and security interests of AME shall be vacated. Notably, NEC paid the full amount required to AME in June 2024.

### SCOPE OF REMAND

To address the parties' contentions in this appeal, we must first address the scope of our remand. If "an appellate court reverses a lower court's judgment and remands the case to the trial court, as we did here, the trial court is authorized to take all actions that are necessary to give full effect to the appellate court's judgment and mandate." *Phillips v. Bramlett*, 407 S.W.3d 229, 234 (Tex. 2013). A mandate formally commands a trial court to enforce the appellate court's judgment. *See* TEX. R. APP. P. 51.1(b). Moreover, the trial court has no discretion "to take any action that is inconsistent with or beyond the scope of that which is necessary to give full effect to [our] judgment and mandate." *Phillips*, 407 S.W.3d at 234; *see also Hudson*, 711 S.W.2d at 630 ("When this court remands a case and limits a subsequent trial to a particular issue, the trial court is restricted to a determination of that particular issue."); *Scott Pelley P.C. v. Wynne*, 578 S.W.3d 694, 699 (Tex. App.—Dallas 2019, no pet.) (providing trial court's "orders carrying out the mandate are ministerial," and "trial court is limited to complying with the instructions and cannot re-litigate issues controverted at the former trial").

---

App.—Dallas 2008, no pet.). However, Judge Canales' retirement is irrelevant where we hold the additional findings are not required, as here.

In determining the scope of remand, we "should look not only to the mandate itself, but also to the opinion of the court." *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986); *see, e.g., Choudhri v. Mokaram-Latif W. Loop, Ltd.*, No. 14-23-00026-CV, 2025 WL 1037254, at *3 (Tex. App.—Houston [14th Dist.] Apr. 8, 2025, no pet.) (mem. op.). Here, our final judgment and remand are based on the portion of our opinion addressing NEC's request in the trial court for specific performance vacating AME's liens. In *AME II*, we explained the trial court erred by granting the "specific performance without requiring NEC to perform its repayment obligation under the Contract." 2019 WL 286121, at *12 (citing *DiGiuseppe*, 269 S.W.3d at 594 (plaintiff must fulfill contractual obligations and must be ready, willing, and able to perform at all times relevant to contract)). When it came to what NEC was required to pay, we noted AME asked us to "modify the judgment to award it $1,511,855.25, which it contends is the undisputed amount of principal, interest, fees, costs, and expenses due on March 28, 2012"—the amount included in the April 2, 2012 payoff letter to AME (dated March 28, 2012). *Id.* We declined to do so, explaining the $1,511,855.25 did "not account for interest payments made by NEC after that date" and therefore "[r]emand [wa]s necessary to determine the amount NEC must pay under the Contract to support the award of specific performance vacating AME's liens." *Id.* Based on this reasoning, we concluded NEC was "entitled to specific performance requiring AME to release its liens and security interests upon tender of payment by NEC of its obligations under the Notes, in an amount to be determined on remand." *Id.* at *17.

Before we issued our mandate, AME filed a motion for rehearing arguing we should "clarify" our opinion and judgment and "order the trial court, in determining NEC's obligations under the Notes, to require NEC to tender a sum that includes principal, accrued but unpaid interest from November 2012[,] and AME's reasonable attorney's fees as the consideration for AME

releasing its liens and security interests." We denied AME's motion, and the Supreme Court of Texas denied its subsequent petition for review. Thereafter, we issued our mandate, which included identical language to the language in the final judgment.

Here, the scope of remand is clear: the trial court was required to determine "the amount to be paid by NEC . . . to AME . . . pursuant to the Convertible Promissory Notes dated February 27, 2009 and September 1, 2009," specifically taking into account the interest payments made between March and November of 2012. The trial court, accordingly, issued a final judgment on remand, along with its findings and conclusions, precisely addressing our judgment and mandate. Thus, AME's assertion, that the trial court erred by not considering its request for additional monies, relating to interest accrued after November 2012, attorney's fees, and collection costs, is overruled.

## LEGAL SUFFICIENCY

AME also appears to argue that the evidence at trial was legally insufficient to support the trial court's findings of fact and conclusions of law that NEC was required to pay AME $1,507,916.67 pursuant to the Notes.[3] Specifically, AME contends NEC failed to present legally sufficient evidence proving that it was at all relevant times ready, willing, and able to pay for the specific performance. Instead, AME contends that NEC's willingness to pay $1,507,916.67 was only a partial payment of its obligations and that, in addition, NEC needed to pay AME for all expenses it had incurred including attorney's fees and costs, interest beyond November 2012, and

---

[3] AME makes certain arguments in its brief, while addressing the scope of remand, that "sound" in legal sufficiency. We therefore construe AME's brief liberally and attempt to address its legal sufficiency argument, in the interest of justice, as best as we can understand it. *See Guidry v. Evans*, No. 04-22-00254-CV, 2023 WL 4338950, at *1 (Tex. App.—San Antonio July 5, 2023, no pet.) ("However, in the interest of justice, we will liberally construe her brief and attempt to address her appellate complaints, which, from what we can determine, amount to a challenge to the sufficiency of the evidence."). To the extent AME has attempted to raise issues in its brief other than those addressed in this opinion, we hold those issues have been waived as inadequately briefed, and we overrule them. *See id.* ("To the extent Guidry has attempted to raise issues in her brief other than those addressed in this opinion, we hold those issues have been waived as inadequately briefed, and we overrule them.").

collection costs. In fact, AME contends the outstanding total amount due is $4,654,803.03. But, as set forth above, the trial court properly limited the issue on remand to that mandated by this court – the calculation of the amount owed, that being principal and interest accrued but not paid through November of 2012.

In essence, AME seeks to secure through our remand a reversal of what it was denied by the trial court and previously by this court. But we are, as the trial court was on remand, bound by our previous opinion as the law of the case. *See, e.g.*, *Roman v. Ramirez*, 573 S.W.3d 341, 348 (Tex. App.—El Paso 2019, pet. denied) ("Under the law-of-the-case doctrine, a court of appeals is ordinarily bound by its initial decision if there is a subsequent appeal in the same case."); *TCI Luna Ventures, LLC v. Branch Banking & Tr. Co.*, No. 05–13–01221–CV, 2015 WL 5050180, at \*2–3 (Tex. App.—Dallas Aug. 27, 2015, pet. denied) (mem. op.).[4] Accordingly, we limit our legal sufficiency review to the question of whether the trial court had legally sufficient evidence before it to support its finding that NEC owed $1,507,916,67 on November 19, 2012.

### A. Standard of Review and Applicable Law

To prevail on a legal sufficiency challenge, AME must "demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). If there is more than a scintilla of evidence to support the trial court's finding, the no-evidence challenge fails and must be overruled. *Id.*; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When we conduct our review, we credit evidence that supports the verdict if a reasonable factfinder could have done so and disregard contrary evidence unless a reasonable factfinder could not have done so. *Id.* And, we consider the evidence in the light most favorable to

---

[4] In its reply brief AME explains our opinion in *AME II* was incorrect to characterize the $1,511,855.25 figure as the undisputed amount owed because AME "also asked for 'interest, costs, and attorney's fees." But in its motion for rehearing, AME did not ask us to correct our opinion on that basis or otherwise file a motion to correct it. *See* TEX. R. APP. P. 19.3.

the findings, indulging every reasonable inference in support of the challenged finding. *See, e.g.*, *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018); *Nigerian Found. v. Umezulike*, No. 01-20-00262-CV, 2022 WL 2923202, at \*5 (Tex. App.—Houston [1st Dist.] July 26, 2022, no pet.) (mem. op.). Finally, we leave issues of witness credibility and the weight to be given their testimony to the factfinder. *See, e.g.*, *Taylor v. Missick*, No. 14-19-01001-CV, 2021 WL 1746081, at \*1 (Tex. App.—Houston [14th Dist.] May 4, 2021, no pet.) (mem. op.) (citing *N. E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 255 n.50 (Tex. 2020)).

### B. Analysis

Here, the parties plainly sought to avoid reinventing the wheel on remand when they agreed that the evidence—exhibits and all testimony—of the 2016 trial was also before the court during the trial on remand, even though they readmitted a subset of exhibits from the earlier trial. One such exhibit, the February 27, 2009 Note, provides NEC promised to pay AME $500,000 "together with simple interest accruing from the date thereof "at the rate often percent (10%) per annum." The September 1, 2009 Note provided the same, except the amount was $1 million. The Notes further provide "All unpaid principal balance of this Note, and all accrued but unpaid interest thereon, shall be due and payable to [AME] on the Maturity Date; . . . provided, however, that in the event [AME] does not convert this Note into [NEC]'s Class A Units of membership interest under the terms hereof and the Purchase Agreement by or on the Maturity Date, the Maturity Date for all purposes hereunder other than conversion shall thereafter be deemed to be 180 days after such date." In our previous opinion, we identified *that* date as March 29, 2012. *AME II*, 2019 WL 286121, at \*1, \*7, \*8. But, as we explained in our previous opinion, although NEC requested a payoff letter prior to the Maturity Date, AME did not provide one until April 2, 2012 stating that the amount owed at that time was $1,511,855.25. *AME II*, 2019 WL 286121, at \*1–2.

AME's April 2nd letter, conditioned its acceptance on receipt of that amount "no later than March 29, 2012, which was four days before NEC received the letter. The letter added that if AME did not receive the payoff amount by that payoff date, an additional per diem charge of $409.84 would be added. Consistent with the letter, NEC's CEO, Christopher Hotchkiss testified that NEC paid, and AME continued to accept, NEC's monthly interest payments until November 19, 2012.

On November 19, 2012, NEC wrote AME a letter, enclosing a cashier's check for $1,507,916.67 for principal and accrued but unpaid interest on the Notes. This figure is consistent with AME's Exhibit R-7A, which includes its own principal and interest calculation identifying the amount due on November 19, 2012 as $1,507,916.67. Moreover, Hotchkiss testified the additional $7,916.67 amount was "additional interest that had been missed" in November at the per diem rate noted above. He further testified the letter was hand-delivered to but rejected by AME, which refused to accept it, but remained available as it was in the form of a cashier's check with the funds controlled by the bank.

AME contends that during the litigation NEC took the position that AME was not entitled to those funds. But, in *AME II* we explained that AME only "ask[ed] this Court to modify the judgment to award it $1,511,855.25, which it contend[ed] is the undisputed amount of principal, interest, fees, costs, and expenses due on March 28, 2012." *AME II*, 2019 WL 286121, at *12. In other words, even AME believed that the relevant time was 2012. We could also reasonably infer in support of the trial court's findings that the trial court specifically identified November 2012 and the time of the remand trial as "relevant times" because it did not find the duration of the litigation to be a relevant time. *See Note Inv. Group, Inc. v. Associates First Capital Corp.*, 476 S.W.3d 463, 484 (Tex. App.—Beaumont 2015, no pet.) ("A proper tender of the just amount owed is . . . a defense to a claim for interest on the obligation accruing after the tender. If the defendant

tenders payment for the full amount owed, and the plaintiff refuses to accept it and proceeds to trial, the defendant is not liable for the plaintiff's attorney's fees and subsequent interest."); *accord*. *DiGiuseppe*, 269 S.W.3d at 594; *AME II*, 2019 WL 286121, at *11; *II Deerfield Ltd. P'ship v. Henry Bldg., Inc.*, 41 S.W.3d 259, 265 (Tex. App.—San Antonio 2001, pet. denied) (providing party that prevents or makes performance impossible upon which its liability depends cannot later avail itself of its nonperformance and if a party fails to perform, it cannot later enforce the remaining terms of the agreement). This is supported by the fact that AME refused payment in November 2012, and, as we explained in *AME II*, AME's request for payment of $1,511,855.25 did "not account for interest payments made by NEC after that date." *AME II*, 2019 WL 286121, at *1; *see DiGiuseppe*, 269 S.W.3d at 594.[5]

Notwithstanding the foregoing evidence, and the limited scope of remand, AME continues to argue that it is entitled to attorney's fees and costs based on the language of the Notes. Section 6 provides, in pertinent part:

> 6. Consequences of Default.
>
> (a) If any Event of Default occurs for any reason, whether voluntary or involuntary, [AME] may, upon notice or demand, declare the outstanding principal indebtedness under this Note to be due and payable, whereupon the outstanding indebtedness under this Note shall immediately become due and payable, and [NEC] shall immediately pay to [AME] all such indebtedness. . . . [NEC] agrees to pay [AME] all out-of-pocket costs and expenses incurred by [AME] in any effort to collect indebtedness under this Note, including reasonable attorneys' fees and expenses.
>
> (b) [AME] shall also have any other rights against [NEC] that [AME] has under the [NPA] and the Security Agreement and pursuant to applicable law. [AME] may exercise any and all of its remedies under the [NPA], the Security Agreement and/or any other agreement between [NEC and AME] relating to this Note contemporaneously or separately from the exercise of any right hereunder.

---

[5] Further, as AME acknowledges, it made this same argument in its motion for rehearing of *AME II*, and we denied the motion.

Section 5 identifies an "Event of Default" as NEC's failure (1) to "pay, within five (5) days after when the entire outstanding principal balance of this Note on the Maturity Date"; and (2) to fully pay, within five (5) days after when due, all accrued but unpaid interest on this Note when and as such interest is due."[6]

For AME to be correct that it was entitled to costs and expenses under section 6, we would have to conclude: (1) NEC failed to pay the entire outstanding principal balance on the Maturity Date and failed to pay unpaid interest when due; (2) AME sent NEC a notice or demand (a) declaring the outstanding principal indebtedness due and payable (b) along with a demand for all out of pocket costs and expenses incurred by AME; and (3) NEC did not pay AME all such indebtedness. But, AME's letter, which was provided after the Maturity Date on April 2, 2012—*in response to a request from NEC*—was not a notice or demand making any such declaration. Instead, it provided that *NEC requested* AME "accept payment in full of all Indebtedness . . . due and payable as of March 29, 2011." AME suggested that it could meet the request, but "[i]n order to meet the request, [AME] must receive [$1,511,885.25] no later than March 29, 2012"—predating the April 2nd letter by four days. The letter added that if AME did "not receive the Payoff Amount in immediately available funds no later than the Payoff Date [already in the past], an additional per diem charge of $409.84" would be added. In other words, we can reasonably infer the trial court found AME's payoff letter provided to NEC, at NEC's request, was not a notice or demand making any such declaration in the event of a default declaring all due indebtedness.

---

[6] The Notes also identify as events of default (a) the occurrence of any Event of Default in the NPA or the Security Agreement; and (b) the appointment of a receiver, trustee, or liquidator, or proceedings for such appointment thereof The NPA provides the same events of default as the Notes and the Security Agreement and includes the following additional events of default: Debtor fails to perform or observe any term, covenant, or agreement contained in the Security Agreement and (i) such failure is not cured within ten days or not reasonably capable within thirty days and NEC shall not have commenced a cure in a manner reasonably satisfactory to Secured Party within the initial ten-day period.

Moreover, Hotchkiss repeatedly testified at trial that AME never placed NEC in default, through that letter or otherwise: "At no time . . . did you put me in default." *See, e.g.* He further testified that as of the maturity date and at all relevant times, NEC was ready, willing, and able to pay, but AME refused payment.

Furthermore, as we stated in our prior opinion, "AME breached the contract on November 19, 2012" when it refused to accept the tendered payoff from NEC and "and that its breach was not excused." *AME II*, 2019 WL 286121, at \*9; *see, e.g.*, *II Deerfield Ltd. P'ship*, 41 S.W.3d at 265; *see also Baker Marine Corp. v. Weatherby Eng'g Co.*, 710 S.W.2d 690, 696 (Tex. App.—Corpus Christi 1986, no writ) (providing breaching party "cannot take advantage of provisions favorable to it contained in the very contract which it was found to have breached" (citing *Sterling Projects, Inc. v. Fields*, 530 S.W.2d 602, 606 (Tex. Civ. App.—Waco 1975, no writ)).[7] Based on the foregoing, we can reasonably infer in support of the trial court's findings that the parties elected to continue their relationship as before, there was no event of default, AME's April 2nd letter did not trigger Section 6 of the Notes, and that NEC remained ready, willing, and able to perform at all relevant times, including when it tendered payment to AME on November 19, 2012 and at present.[8] *See Nigerian Found.*, 2022 WL 2923202, at \*5; *cf. Osborne v. Mutzig*, No. 04-02-00554-CV, 2003 WL 21010609, at \*4 (Tex. App.—San Antonio May 7, 2003, no pet.) (mem. op.)

---

[7] AME notes that in *AME II* we affirmed the jury's finding "that NEC breached the Contract by failing to deliver the loan payoff by April 3, 2012," in support of its argument of default. *AME II*, 2019 WL 286121, at \*2. But as we explained: "Although the jury found that NEC breached the Contract by not tendering payment by April 3, 2012, it also found that AME's performance was not excused by that breach. This necessarily means that the jury found that AME treated the Contract as continuing or continued to accept benefits under it." *Id.* at \*8 (footnote omitted). And as we further explained in our prior opinion, "AME does not challenge the sufficiency of the evidence supporting the jury's implicit finding." *Id.* at \*8 n.4. Moreover, "[t]he finding that AME's breach was not excused *even though* NEC committed a prior breach establishes AME's liability for breach of contract and NEC's entitlement to a remedy for that breach." *Id.* at \*9.

[8] We make the same reasonable inference as to the Security Agreement provisions cited by AME which provide NEC was required to pay out-of-pocket expenses "upon demand." *See Nigerian Found.*, 2022 WL 2923202, at \*5. And such an inference would likewise support the trial court's findings.

(providing although parties gave other parties oral notice of party's nonpayment, this was not sufficient to give notice of declaration of default). Such a reasonable inference would support the trial court's findings that NEC was required to pay AME $1,507,916.67 on the Notes. *See Note Inv. Group, Inc.*, 476 S.W.3d at 484.

Again, in contravention to the scope of remand and law of the case, AME further argues it was entitled to "actual expenses" pursuant to section 9, which provides NEC "agrees to pay, in addition to all other amounts owing hereunder, all actual expenses of collection of this Note, all court costs and reasonable attorneys' fees incurred by the holder hereof on account of such collection." But, the Notes do not define collection. Black's Law Dictionary defines the "costs of collection" as "[e]xpenses incurred in receiving payment of a note; esp., attorney's fees incurred in the effort to collect a note." *Costs of Collection*, BLACK'S LAW DICTIONARY (12th ed. 2024). Meriam-Webster defines "collect" as "to claim as due and receive payment for." *Collect*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/collect (last visited Aug. 22, 2025). But based on the foregoing record and testimony addressing section 6 of the Notes, we can reasonably infer the trial court found AME did not attempt to collect on the Notes but only provided a payoff letter at NEC's request, continued to accumulate interest payments from NEC without dispute, and therefore had no actual expenses of collection on the Note.

Moreover, as we explained in *AME II*, NEC asked AME to provide it any "alleged reasonable collection costs" in its November 2012 letter. Hotchkiss testified on remand that for NEC to be charged with such costs AME had to notify AME it was in default. Further, Hotchkiss testified AME never provided it with any such costs even though it was ready, willing, and able to pay them. Based on Hotchkiss's testimony, we could reasonably infer the trial court found AME had no such costs through November 2012.

Accordingly, the evidence at trial is legally sufficient to support the trial court's findings that NEC was required to pay AME $1,507,916.67 and was ready, willing, and able to perform at all relevant times. *See City of Keller*, 168 S.W.3d at 819, 827.

## CONCLUSION

The trial court's December 6, 2023 final judgment on remand is affirmed.

Lori Massey Brissette, Justice